C. J. ROOT v. HAYES WOOD, as Tax Collector for Dade County, Florida.

21 So. (2nd) 133 January Term, 1945
January 26, 1945 En Banc
Rehearing denied March 21, 1945

*Jennings & Watts, Olin E. Watts* and *Ralph M. Ketcham,* for appellant.

*Keen & Allen, Walton, Hubbard, Lantaff, Atkins & Carson* and *C. Clyde Atkins,* for appellee.

TERRELL, J.:

Prior to 1938, First Trust and Savings Bank as trustee for W. R. Root and others, was the owner of 1000 shares of stock being all the capital stock of Orlando Investment Company, a holding company owning stock in other subsidiaries and associated companies. None of this stock had been sold or listed on the stock exchange and none of it could be sold under the terms of the trust until after the death of two of the three beneficiaries.

In the years 1938, 1939, and 1941, the trustee made return of this stock as intangible personal property, hereafter referred to as intangibles, to the Tax Assessor of Dade County at $860 per share or a total value of $860,000. The trustee also returned the said intangibles to the Tax Assessor of Duval County, including Federal Income Tax Return, showing assets, profits and dividends to stockholders. The Tax Assessor of Dade County was advised of the Duval County return and imposed an assessment on the intangibles in the amount at which they were returned for the years 1938, 1939,

and 1941, but for the year 1940, he imposed an assessment on them of $1720 per share or a total of $1,720,000. Under this assessment, the tax roll was submitted to the board of equalization, was on examination approved by them without objection and the taxes paid accordingly.

In July, 1942, the Comptroller on investigation reached the conclusion that this stock was undervalued and directed the tax assessor to make a further assessment as follows: for the year 1939, $10,795,150; for the year 1940, $8,843,550; and for the year 1941, $8,124,190. This assessment required the collection of an additional tax for the year 1939 of $9,935.15, for the year 1940 of $7,123.55 and for the year 1941 of $7,264.19, or a total additional tax of $24,322.89. Based on the direction of the Comptroller, the Tax Assessor made the additional assessment and notified the trustee who made written protest to the tax assessor and board of equalization, but its protest was ignored for the reason that the tax assessor and the board of equalization felt that they were bound by the order of the Comptroller and had no discretion in the matter. The trustee was accordingly denied any opportunity to resist the additional tax assessment by the Comptroller, the Tax Assessor, or the Board of Equalization.

At this point, the Barnett National Bank of Jacksonville was substituted as trustee and in November, 1942, filed its original and amended bill of complaint against the Tax Collector of Dade County seeeking to invalidate and restrain the collection of the additional assessment. The answer admitted some allegations of the bill of complaint, avoided others, and charged fraud on the part of the trustee in returning the intangibles for taxation. On motion of complainant for final decree on bill and answer, the chancellor held the additional assessment to be illegal on the theory that the intangibles had not "escaped" taxation but in other respects he denied the motion and set the cause down for trial on the issue of fraud. On final hearing, he found the charge of fraud to be well supported and dismissed the bill with prejudice at the cost of the plaintiff. This appeal is from the final decree. Shortly before the entry of the final decree the trust was terminated by the death of two of the beneficiaries when C. J.

Root became the sole owner of the trust estate and was substituted as the party plaintiff.

Counsel are so wide at variance as to what questions were brought here for determination that we are relegated to the record to assess them. The sole and only question may be encompassed in the following: Was the final decree correct? As to that part adjudicating the additional tax to be illegal, we answer this question in the affirmative. In all other respects, we answer in the negative for the reasons following.

The law for the classifying, valuation, assessing, making returns of, collecting and disposing of intangible taxes is embraced in Chapter 15789, Acts of 1931, as amended by Chapter 20724, Acts of 1941, now Chapter 199, Florida Statutes of 1941. The duties of the tax assessor, tax collector, comptroller, and county commissioners relating to intangible taxes are also defined by these acts. Chapter 15789 became effective January 1, 1932, and was succeeded by Chapter 20724 in June, 1941.

Section 199.07, makes it the duty of every person, firm, or corporation owning or having the management of intangibles subject to taxation to return them under oath to the tax assessor on or before the first day of April of each year, giving their cash value, description, and location. By Section 199.09, the return so made is presumed to be correct unless the tax assessor shall by his personal knowledge or on investigation find that the taxpayer is possessed of intangibles not described in his return or that he fails to give the cash value of those returned. In this event the tax assessor shall make a proper return or assessment and give notice to the owner who shall have the right of appeal from the decision of the tax assessor to the board of county commissioners sitting as a board of equalization. Subject to this right of appeal, the tax assessor is at all times given the power to investigate and determine the "true taxable value" of intangibles returned to him for tax assessment. Section 199.10.

When the intangible tax roll is prepared by the tax assessor, he is required to submit it to the board of county commissioners who sit as a board of equalization for the purpose of hearing complaints, taking testimony, reviewing,

revising, and equalizing the assessments. The board may make such changes in assessments as seem just and they may make additions of intangibles to the tax roll if they find any to have been omitted. If increases in assessments are made, notice thereof shall be published and the owners given an opportunity to complain and give testimony on a day certain as to such increases. On the day so fixed, the board of equalization shall determine the true and just amount of such assessments in the same manner as provided for the equalization of personal property, Section 199.12. When no complaint is made as to the assessment or valuation, it shall be deemed to have been fair and just and equal and validly made. Section 199.13.

The Comptroller is authorized to prescribe forms and to make rules and regulations to execute the intent of the intangible tax act, Section 199.03. He may also make recommendations to the Governor with reference to the conduct of tax assessors, tax collectors, county commissioners, clerks of circuit court, and sheriffs with reference to the performance of their duties under the Act, Section 199.32, but the powers vested in the comptroller that are pertinent to this case are defined in the quoted part of Section 199.17, as follows:

"The Comptroller shall make independent investigations concerning the intangible personal property assessment rolls and he shall ascertain by diligent search and inquiry whether all persons, firms or corporations have made proper returns and whether all intangible personal property subject to taxation has been assessed, and advise the tax assessors of his findings. The Comptroller may employ such persons as may be necessary to enable him to perform his duties under this Act. The tax assessors shall utilize the information furnished by the Comptroller and enter upon the assessment rolls all intangible personal property certified by the Comptroller to be intangible personal property subject to taxation in their respective counties; . . ."

We find nothing in this provision to authorize the Comptroller to make assessments of intangible personal property. We find that duty vested exclusively in the tax assessor subject to revision by the board of equalization as outlined in

the forepart of this opinion. The duty of the comptroller is to investigate intangible personal property tax rolls and see that all property owners have "made proper returns" and have returned all "property subject to taxation" and "advise the tax assessor of his findings." The tax assessor "shall utilize the information furnished by the comptroller" and enter any property certified to him by the comptroller on the assessment rolls. The proviso of the quoted Section has to do with making the assessment in case the assessment roll has been delivered to the tax collector but it is not relevant to this case and is not quoted.

In at least six different Sections of the Act, the duties of tax assessors with reference to the assessment of intangibles is defined but we find nothing within its four corners that even remotely refers to the comptroller as being vested with that power. He is clothed with power to examine and review the tax rolls and otherwise aid the tax assessor. In order to perform this function, he is authorized to "make independent investigations concerning the intangible personal property assessment rolls," and if he finds that any intangibles have not been properly returned, that is to say, returned at less than cash value, or they have not been returned at all, he advises the "tax assessor of his findings." It then becomes the duty of the tax assessor to "utilize the information furnished by the comptroller." If from the information furnished, he finds that intangibles have not been included in the rolls, he (tax assessor) shall proceed to enroll and assess them as provided by Section 199.09 unless the tax rolls have been certified to the tax collector in which case he (tax assessor) shall proceed as required in the proviso to Section 199.17.

The intangibles involved in this case were 1000 shares of stock in Orlando Investment Company and it is affirmatively shown that every share was returned to the tax assessor for assessment, but it is contended that it was returned and assessed at a value far below its cash value; in other words, an improper return was made. It is also contended that this error permeated the assessments for the three previous years, 1939, 1940 and 1941, by reason of which all the stock escaped

taxation for said years, and being so, it should now be back assessed for three years as provided by Section 199.29.

To counter this contention of appellee, appellant contends that Section 199.29 applies only to the assessment of intangibles previously omitted from the assessment roll and that since the intangibles in question were duly returned as required, the Act has no application in this case. We do not think there is any merit to this contention because Section 199.29 clearly contemplates that all intangibles be returned at full cash value and if the tax assessor should find from personal investigation or from information furnished him by the comptroller that any intangibles were not so returned to the extent that such return and assessment was later found to be less than cash value, it will be considered as having escaped taxation for any one or all the three years that back assessments are authorized.

We do not think however that such an assessment can be made by anyone other than the tax assessor and that it should be made is required by Section 199.09 after notice to the taxpayer giving him opportunity to be heard and give evidence in support of the integrity of his return. Section 199.29 authorizing back assessments requires that they be made in "like manner" as those of the year in which the assessment is made. It is out of the question to contend that an ex parte assessment may be made against his intangibles without any notice to him whatever or without any opportunity to be heard when the assessment rolls have been long since approved and closed and under the statute, Section 199.13, the assessment deemed to be "fair, just, and equal and validly made according to the laws of Florida."

The record does not show that any aspect of the law was observed in making the assessment in question. In fact, we are constrained to believe that it was made under a complete misunderstanding of the law. No notice to the taxpayer was given; his protest was ignored; he had no opportunity to be heard; the tax assessor imposed the tax and the board of equalization approved it both disclaiming any responsibility whatever for it and both asserting that they were bound by the order of the comptroller and had no power or discretion

to consider or modify the assessment made by him. The tax roll was certified to the tax collector with directions to proceed to collect the tax without any opportunity to the taxpayer to be heard anywhere any time. In other words, it is proposed to reach down in his pocket and take out $24,322.89 without so much as tossing him a smile or a "Pardon me, please." Such a procedure is contrary to every principle of our constitutional theory and to construe the intangible tax law in this way would render it totally unconstitutional.

The chancellor predicated his final decree on the theory that the taxpayer was guilty of fraud and deception in making return of his intangibles for taxation. His judgment appears to be based on the discrepancy between the value placed on the stock in the return and what he construed to be the "undisputed value of the stock" as shown by the record. We are not advised as to whether he had in mind "book value," "cash value," "true value," "established value," "valuation for tax purposes," or some other value. We find all these terms used in connection with the assessment of intangibles and each with different connotations. The statute, Section 199.04, uses "valuation for tax purposes."

Since the record shows that all the stock in question was returned by the trustee, there is no question here of failure to make return of intangibles. The sole question is whether or not they were returned at their "true taxable value." It is a reasonable assumption that the valuation was based on the result of taking the previous five years of the trust income, averaging that, and capitalizing on a 20 percent basis and multiplying by five. The tax assessor testified that his policy was to use a four per cent capitalization value of the dividends or interest received as based on income tax report information. The return challenged was made by the trustee (a respectable banking institution) for the owners who is not shown to have had any inducement to make other than what appeared to it a proper return. At any rate, it is shown that the return in this case was made from a formula agreed on by the tax assessor and trustee. The fact that it was too low, if it was, does not render it fraudulent.

Appellee contends that since this was a close corporation,

the fair market value of the stock could have been ascertained by dividing the value of the assets by the number of shares of stock. It is quite true that when all the stock of a close corporation is owned by one person or family and none of it has been sold or listed on the stock market, it may be valued in this way but even when this rule is employed, ratio of assets to liabilities, funded debt, character of assets, value of assets, volume of business, impermanence of the business, attractiveness of the stock to investors, stability of net income from the assets, or any other impediments to true taxable value may be considered when making the stock assessment. City of Tampa v. Colgan, 121 Fla. 218, 163 So. 577. The value of the assets is only one element to be taken into consideration and when all the elements that affect it are considered, its true taxable value is often reduced to the composite judgment of those versed in such valuations and at best will be nothing more than approximation. The authorities generally recognize that such valuations are mere judgments and as near an approach to accuracy as human frailty will permit.

The record discloses that the income distributed to the Root trust during the years 1938 to 1942 inclusive, varied from $709,824.15 to $113,971.75, that the dividends paid by Orlando Investment Company to the Root trust during the years 1937 to 1942 inclusive, varied from $800,000 to $175,000, and that the net income (or net loss) of Orlando Investment Company from 1933 to 1937 varied from a net loss in 1933 of more than $71,000 to a net income of $830,576.78 in 1937. The cash dividends paid during the latter period varied from zero in 1933 to $300,000 in 1937. These figures reveal the temperamental nature of the income from the trust and being so, the stock would not be attractive for trust fund investment. It might be attractive to those who play the stock market for quick turnover but the prudent investor of his ward's funds would not be attracted by it.

No aspect of the law of tax assessments is fraught with more perplexities than that of assessing intangibles. In the three preceding paragraphs, we have noted some of the factors that may enter into their assessment as well as the formula that may be employed to do so, but the list is not

complete. It would not be possible to prescribe a formula to determine true taxable value in all cases. That used by the tax assessor and the trustee may suffice in many cases but at best any formula will have its imperfections. Many cases will have to be resolved by consideration of the peculiar factors that affect them. The composite judgment of men versed in intangible evaluations, seasoned with common sense, is the safest guide in such cases and will be found to be the best formula in many others. A fair market value has been defined as that which a purchaser willing but not obliged to buy, would pay to one willing but not obliged to sell. In arriving at fair market value, income is only one factor to be considered. It is beside the question to contend that liabilities and other factors must not be considered. Both the 1931 and the 1941 acts clearly contemplate this. The intangibles in question were returned under the 1931 Act and are governed by it. Both acts employ the terms "true taxable value," "true and just value," valuation for tax purposes," and perhaps others but they all bear reference to and are synonymous with "fair market value." The 1931 Act did not require intangibles to be returned under oath at full cash value but did provide that taxable value be "on the same basis of valuation as is used for the assessment for taxation of real or personal property." The 1941 Act omitted the latter requirement and provided that all intangibles be returned under oath at full cash value. The 1931 Act did not provide for three years back assessments of intangibles or for the review of tax rolls by the comptroller as does the 1941 Act but both acts pronounce the "true and just value" of intangibles as found by the board of equalization "after a hearing" to be final.

The test of any formula is not whether it "milks" the taxpayer dry but whether or not it arrives at the "true taxable value" of the intangible. It is not to be confused with an income tax, as was apparently done in this case. Skill in administration is the big factor in determining gross income from a tangible or intangible asset but it may have little relation to value in either case. Farmer Brown and Farmer Jones each own a farm, same acreage, same character of

land, same distance from town and paved road, and same relation to other attributes that affect value. At assessing time, the tax assessor imposes the same value on both farms for taxable purposes. Farmer Brown is of the old fashioned school who does his candle light stuff and gets with the grass and weeds and bugs as soon as he can see how, tills his soil well, husbands his live stock and makes a bumper crop. Farmer Jones is something of a modernist; candle light hurts his eyes and he cannot get up until after the sun sets the example. He is high up in the bench warmers' guild, trusts his crop to "providence" and gets off to the town park, as soon as his wife gives him breakfast, to enlighten his brotherhood as to solution of the problems of Church, State and Nation. When harvest time comes, Farmer Brown has ten times as much crop as Farmer Jones but when tax paying time comes, there is no theory under which ten times as much taxes can be exacted of the one as the other. So Farmer Brown has plenty of brown gravy to put on his biscuit but the tax assessor should not toss and tumble in his sleep because he does not find some way to scrape it off before he eats it. Even if Farmer Brown gets a "break" now and then, why worry? God knows, he is entitled to it and it is not a factor that would warrant a hike in his taxes. The assets on which the 1000 shares of stock in this case is predicated is stock in various and sundry Coca Cola bottling businesses, the income and value of which will depend on management and other factors. We have previously shown how it fluctuates. It is foolish to contend that fair tax value should not be measured by a formula that contemplates these factors.

What we have said disposes of the question of "fraud" and "clean hands." The stock of appellant was returned for each of the years in question at a value which the tax assessor accepted and by a formula shown to have been followed by his office in making such assessments. It was approved by the board of equalization and by the terms of the law was presumed to be correct. Even if the assessment was too low, which we do not decide, this shows such an attempt to comply with the law as would rebut the charge of fraud unless actual deception is otherwise shown.

It is not out of place to state that we found by experience that intangibles could not be reached and assessed under the law governing the assessment of tangible property. We amended the Constitution (Section One, Article IX) in 1924 to authorize the Legislature to provide "special rate or rates on intangible property," the ceiling then fixed having been modified by recent constitutional amendment. The Constitution and the statute herein discussed both recognize the inherent difference in the rules that must govern the assessment of tangibles and intangibles. The assessment of intangibles is the job of one versed in their valuation because they fluctuate under so many influences that do not affect tangibles. It may not be so difficult to assess the value of a tract of land, a stock of goods, a herd of cattle or a mule, but the proposition of assessing paper "which derives its chief value from that which it represents" is a very different matter and demands a different field of learning on the part of the assessor. If the law is not administered in a way to encourage owners of intangibles to bring them out for assessment, it will fail of its purpose.

We therefore hold that there is a complete absence of fraud in the record, that under Chapter 199, Florida Statutes of 1941, the tax assessor is vested exclusively with the power to assess intangibles subject to review and equalization by the board of county comissioners sitting as a board of equalization, that the comptroller has no power to make assessments of intangibles; he may make rules for the guidance of tax assessors not inconsistent with the law; he may investigate intangible assessment rolls to see that all intangibles subject to taxation have been properly returned and assessed and make report of his findings to the tax assessors. His function is that of an aid, advisor, or collaborator with, but not the director of, the assessor. It is the duty of the tax assessor to consider the information furnished him by the comptroller and if he finds that error was committed, revise the assessment as pointed out in this opinion without any, constraint on the part of the comptroller. If the information sheds no new light on the assessment made by him it should stand.

The judgment appealed from is therefore affirmed in part and reversed in part but with directions to the chancellor to dismiss the bill of complaint without prejudice to the tax assessor to utilize the information furnished him by the comptroller and review the assessment in the manner provided by Section 199.09. If he finds in reconsideration that he committed error and that the taxable value placed on appellant's intangibles is materially lower than that placed on other intangibles under like conditions, or that he applied a formula that results in inequality as between others, he may proceed to make new assessments for any one or all of the three years it is found to have been assessed too low. Such assessment as he imposes will be subject to review by the county equalization board and its judgment will be final unless shown to have been made in disregard of the views expressed in this opinion.

Reversed with directions.

CHAPMAN, C. J., BUFORD and ADAMS, JJ., concur.

BROWN, THOMAS and SEBRING, JJ., concur in part and dissent in part.

SEBRING, J., concurring in part and dissenting in part:

I concur in part and dissent in part. I agree with the conclusion that no fraud was established but I cannot agree that under the taxing statutes, as applied to the facts of the case, any legal authority now exists for back assessing the properties involved in the suit.

BROWN and THOMAS, JJ., concur.