HENDRY, Judge.
This appeal was taken by the defendant below, the Dade County Taxing Authorities, from a final judgment and decree of the Circuit Court of Dade County. The plaintiff in this action is a corporation whose principal asset is the property on which a thriving shopping center now exists. At issue is the proper ad valorem tax assessment of three particular portions of the total property.
In 1965, the taxing authorities assessed the three parcels of land at a total value of $889,520.00. In 1966, the same three parcels were assessed at $3,360,210.00. This action was originally brought to test the correctness of the method or methods used by the taxing authorities in arriving at their 1966 assessment for the property.
Before we set forth the trial court’s finding regarding the value of each particular folio, some factual detail is essential. Prior to 1961, almost all[1] of two major tracts of land were owned in fee simple by Ar-vida, Inc., a real estate corporation. In 1961, Arvida entered into a leasing agreement with Federated Stores, Inc., wherein Arvida’s entire interest was leased for a period of 99 years. Thereafter, Federated sub-leased all the Arvida property to Dadeland, Inc., the appellee here, retaining for itself only the 2.29 acres which it owned in fee simple before the first lease with' Arvida. Dadeland, Inc., was a subsidiary of its parent, the Joseph Myerhof Corporation, and had been created for the purpose of developing and operating the shopping center venture.
In 1962, Dadeland and Federated entered into' an operating agreement, which set forth the expectations of the parties with regard to Dadeland’s forthcoming efforts in developing the property into a successful venture. Among its lengthy provisions, the operating agreement set forth certain restrictive covenants to run with the land, which in effect bound Dadeland to develop only up to a certain amount of the property. The balance of the land remaining was divided into separate categories with regard to the applicable restrictions.
The first category of the remaining undeveloped land was dedicated solely to future expansion, requiring first, however, *846 approval from Federated and conformity with technical specifications which governed the ratio of parking space to floor space in the buildings to be constructed. The other category was required by restrictive covenants to be utilized solely for access roads and paved parking areas for free public parking. All of these restrictive covenants bound the shopping center property for a period of 20 years, or so long as one of the retail stores, Bur-dine’s,[2] or its successors operate a retail store, whichever is longer. The business justification underlying the restrictive covenants was to insure that the shopping center’s physical growth would be in proportion to the area’s economic growth. Therefore, the restrictions would prevent a situation wherein too many tenants of the center were competing for a limited market in the neighborhood.
In 1965, Dadeland entered a series of transactions designed to secure for itself fee simple ownership of the entire shopping center property, with some minor exceptions. To achieve this, Dadeland made an outright cash purchase from Arvida, Inc., of all Arvida’s interest in the two main tracts. Then, Dadeland negotiated to acquire the outstanding leasehold interest held by Federated. In the latter transaction, Federated conveyed all its leasehold interest in the Arvida property for a cash amount, plus receipt of an encumbered interest in 5.71 acres of land adjacent to the Burdine’s store.[3] The encumbrances on this 5.71 acres of property include, among other outstanding liens, the identical restrictive covenants that apply to much of the property at issue here. The tax stamps affixed to the deed for the 5.71 acres indicated a consideration of $84,-000.00.
The final transaction involving these parties that is part of the record on appeal is an “Operating Agreement”, made January 11, 1966, between Federated Department Stores, Inc., and Dadeland Shopping Center, Inc. We shall return to the effect of this agreement later in this opinion; however, suffice it to say at this point that this “Operating Agreement” has raised several questions of fact which we will remand for resolution, but which do not in any way affect the issues of law which we are about to resolve.
At the heart of this appeal is the simple question: Did the chancellor act contrary to law or abuse his discretion in his final decree ?
Our first source of guidance here is Fla. Stat., § 193.021, F.S.A. Before this statute was enacted in 1963 the tax assessor’s wide discretion in computing “just valuation” had caused numerous difficulties. E. g., State ex rel. Glynn v. McNayr, Fla.1961, 133 So.2d 312; Schleman v. Conn. Gen. Life Ins. Co., 151 Fla. 96, 9 So.2d 197. The Legislature enacted section 193.021 in an effort to give the county tax assessors a yardstick with which to evaluate “just valuation” in accordance with Art. IX, Section 1, of the Florida Constitution, F.S. A. The statute now sets forth eight specific factors to be considered by the county assessor:
“(1) The present cash value of the property;
“(2) The highest and best use to which the property can be expected to be put in the immediate future; and the present use of the property;
“(3) The location of said property;
“(4) The quantity or size of said property;
“(5) The cost of said property and the present replacement value of any improvements thereon;
“(6) The condition of said property;
*847 “(7) The income from said property; and
“(8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing.”
In Walter v. Schuler, Fla.1965, 176 So.2d 81, the Supreme Court’s consideration of section 193.021 resulted in blending the “just valuation” concept with the specific factors enumerated in the statute. The first premise set forth by the court stated:
“We agree with the chancellor’s view that Sec. 193.021 was not intended to give assessors an almost unbridled discretion in the performance of their duty to establish just valuation. Rather, we regard the Act as an attempt by the Legislature to pin the assessors more firmly to the Constitutional mandate.”- Id. at 85.
The Supreme Court then reaffirmed the classic formula for determination of “just valuation” as “ * * * the amount a ‘purchaser willing but not obligated to buy, would pay to one willing but not obligated to sell.’ Root v. Wood, 155 Fla. 613, 21 So. 2d 133.” Id. at 86.
Finally, the court combined the two positions just given by stating:
“If the assessors will apply [the ‘willing buyer’ test] and in doing so observe the seven[4] guideposts in Sec. 193.021, justness should be secured to the taxpayer and the tangle that has developed should be unraveled.” Id. at 86.
Lanier v. Overstreet, Fla.1965, 175 So.2d 521, was a case dealing with the correctness of the tax assessor’s valuation of agricultural property. At issue was whether the tax assessor could properly consider the potential use to which the land could be put. The Supreme Court answered that the taxing authorities could not consider potential use, and in so answering, directed attention to Fla.Stat. 193.021, F.S.A.:
“The latest legislative directive of this subject, Ch. 63-250, Acts of 1963, appearing as Section 193.021, Fla.Stat., 1963, F.S.A., is in accord with its previous pronouncements in this field. By authorizing tax assessors to consider, as one of the factors ‘[i]n arriving at a just valuation’ of property, the use to which the property ‘can be expected to be put in the immediate future’, the legislature has, under the familiar rule of expressio unius est exclusio alterius, prohibited tax assessors from considering potential uses to which property is reasonably susceptible and to which it might possibly be put in some future tax year, or, even, during the current tax year. To be considered, the use must be expected, not merely potential or a ‘reasonably susceptible type of use’; it must be expected immediately, not at some vague uncertain time in the future.” (Emphasis by the court.) Id. at 524.
In Staninger v. Jacksonville Expressway Authority, Fla.App.1966, 182 So.2d 483, the question was whether or not the restrictive covenants on the property at issue should have properly been considered in reaching a just valuation in a condemnation action. The court felt that it was a proper element, and this position is taken by the great weight of authority in the U. S. See Annot., 55 A.L.R.2d 773 (1957).
Staninger’s main holding discussed the evidentiary weight to be afforded restrictive covenants on property when such property was being valuated. However, a second problem is raised by the opinion, and that problem is this: What consideration may a court give to the likelihood that the restrictive covenant will be removed?
This question resulted in a specially concurring opinion by Judge Wiggington, *848 182 So.2d 483, 489, whose reasoning we accept here:
“If the probability or likelihood that covenants restricting the use of land for purposes lower than its highest and best use are about to expire by their own terms or be removed, or may readily be removed either by agreement of the parties to such covenants, or by judicial decree, the. land owner whose property is sought to be taken by eminent domain should receive the benefit of such contingency, likelihood or probability. Land restricted by covenants for a stated use but later zoned for a higher and more profitable use has a higher market value if the restrictive covenants will expire within a period of weeks or months than would be the case if the restrictions will remain on the land for an extended period of time. By the same token, land restricted by covenants for residential purposes will have a higher value if it can be shown that such restrictions may be removed by the payment of money thereby freeing the land for business or commercial use. Under the willing buyer and willing seller test employed in determining the fair market value of property, the willing buyer would most certainly take into account the existence of such contingencies, likelihood or probability in forming a judgment as to the amount he would be willing to pay for the land in question. By the same token, an owner who is willing but under no compulsion to sell would likewise take such factors into account in determining the price at which he would be willing to sell his property. To hold otherwise would be entirely unrealistic and contrary to the most rudimentary business principles.” Id. at 489-490.
This approach is certainly applicable to tax assessments as well as eminent domain condemnations. Such consideration, when applied to the restrictive covenants on a piece of property, thus allows the taxing authority to include in its assessment mitigating factors which detract from the actual restrictions imposed by the restrictive covenants in question. Therefore, such covenants inserted into a chain of title which are impotent, meant only as a sham technicality so as to thwart a true valuation by the taxing authorities, can thereby be properly evaluated. However, lest we be misconstrued by the taxing authorities, we hasten to add that such an appraisal of the effects of a restrictive covenant must also be made in the light of practical probability in the near future, Walter v. Schuler, supra.
Turning now to the chancellor’s decree, in respect to his finding that the tax assessor employed an incorrect method of valuation as to the restrictive property, we affirm.[5] The experts testifying for the taxing authorities used the “income capitalization”, also known as the “land residue” method of evaluating the entire shopping center property. This method, in effect, takes the total income yielded by a given piece of property, subtracts amounts for recapture, depreciation, return of investment, and anticipated property taxes, and leaves a balance, or “residue”, which presumably represents the income produced by the property. Once a figure had been derived by this means, the taxing authority applied the same value to each square *849 foot of the entire center disregarding the nature of the restricted property. We agree with the chancellor that this practice resulted in an inequitable valuation as to the property. By no means are we excluding the “income” approach in appraising real property. See McNayr v. Claughton, Fla.App.1967, 198 So.2d 366. Rather, “ * * * [T]he income from said property * * *” Fla.Stat. § 193.021(7), F. 5.A., is one of eight factors to be considered.
Another problem which has been raised is evidentiary in nature and relates to the chancellor’s determination of value. That issue is: whether the 1965 transaction between Dadeland and Federated is competent evidence to establish the value of other property similar to the 5.71 acres conveyed by Federated. First, appellants urge that this deal was not a sale, but only an exchange. The reason given is that unless there is an exchange of cash by the one party, for an unencumbered fee simple interest by the other, then there is no sale for evidentiary purposes of establishing value. We cannot accept this argument on the facts at bar. Dadeland could convey only that which it owned in the 5.71 acres, and no more. The encumbrances are not extraordinary, but are commonly found attached to parcels of urban property.[6] Moreover, the very reason for the relatively low price of the 5.71 acres lies in the combined effect of these encumbrances and the restrictive covenants.[7] We therefore agree with the chancellor that the transaction of 1966 was a proper sale for purposes as evidence of the value of other property under similar restrictions.
We also call attention to the presumption of consideration created by the recital and attachment of revenue stamps to the deed for the 5.71 acres. Kelly v. Threlkeld, Fla.App.1966, 193 So.2d 7.
The next question as raised by the appellants, is whether the chancellor erred in holding that Dadeland’s property assessed under folio numbers 004 and 095 had a fair market value of $.33 per square foot. Earlier, in our recitation of the facts, we called attention to a certain instrument entitled “Operating Agreement” and dated January 11, 1966. We have examined this agreement closely, and find that its provisions, especially Articles III and VI, raise some doubt as to whether the restrictive covenants, which were the subject of our foregoing discussion, did in fact continue to affect the property in folios 004 and 095. We need not set forth the specific details of the questions raised, but do hereby remand the order appealed so that a further determination of this fact may be made.
Therefore, for the foregoing reasons, the order appealed is modified and remanded for further proceedings consistent herewith.

. A 2.29 acre section of one tract involved here was owned in fee simple by Federated Stores, Inc., having been purchased before 1961.

. Burdine’s Department Store was built on the 2.29 acres of land owned by Federated.

. Federated intended to use this 5.71 acres for future additions to Burdine’s and therefore bargained for it in the conveyance of its leasehold to Dadeland.

. Amended in 1967 to include eight specific provisions.

# * * He * :¡s #
‘'The court is not unmindful of the wide latitude and discretion permitted a tax assessor in fixing valuations. The Dade County Tax Assessor in 1965 reached the conclusion that the just valuation of the land here involved was $889,520. Without the slightest change in the land or its use, the tax assessor in 1966 assessed this land at almost four times this value, or $3,036,210. No ascertainable reason can be found for this drastic change and as far as this record discloses, none exists.
“It is therefore, ORDERED, ADJUDGED AND DECREED AS FOLLOWS:
“(A) That the equities of this cause are with the plaintiff and the plaintiff has stated in its complaint and maintained by its proof, facts which entitle it to the relief sought.”
He H< H* He

.
* * * * *
“SUBJECT TO:
“1. All taxes and assessments for the year 1966 and subsequent years.
“2. Riparian rights, reversionary interests and water privileges, if any, in Canal C-2 (Snapper Creek Canal).
“3. Utility installations, utility franchise agreements and utility easements, of record as of the date of this instrument.
“4. Easement and right of way over the West 35 feet of the East 845 feet of the SW % of Section 35, Township 54 South, Range 40 East granted to Federated Department Stores, Inc. by Kendall Center, Inc., dated May 24, 1960 and filed May 25, 1960 under Clerk’s File No. 60R-94108.
“5. Easements and encumbrances arising out of a certain unrecorded Operating Agreement dated as of January 11, 1966 between Federated Department Stores, Inc. and Dadeland Shopping Center, Inc., a memorandum of said agreement having been filed for record with the Clerk of the Circuit Court, Dade County, Florida, under Clerk’s File No. 66R-43736.
* * * % * * ”

. The restrictions arise from the Operating Agreement of Jan. 11, 1966, note 6 supra. This Operating Agreement, however, is questionable as to its effect in toto, infra, and the court’s determination of its true effect on remand will, consequently, affect the validity of this evidence.