688 So.2d 431 (1997)
Carolyn LOBATO-BLEIDT and Limited Gaming of America, Inc., a Colorado corporation, Appellants,
v.
Robert LOBATO, Appellee.
No. 95-1862.
District Court of Appeal of Florida, Fifth District.
February 28, 1997.
*432 Scott R. Rost of Doran, Walters, Rost, Selter & Wolfe, Daytona Beach, for Appellants.
James A. Chereskin, Daytona Beach, for Appellee.
W. SHARP, Judge.
Carwin Bleidt, Carolyn Lobato-Bleidt, and Limited Gaming of America, Inc., a Colorado management and development company, appeal from a final judgment in favor of Robert Lobato. The final judgment set aside Limited Gaming's severance agreements, shareholders' agreements and issuance of additional stock, as attempts to defraud Robert, a judgment creditor of Carwin. The Bleidts argue that the documents and corporate actions were undertaken for valid business reasons, which should be given deference, and that Robert's claims are barred on various grounds. We disagree and affirm.
This case arises out of the complicated activities of three related individuals involved in a closely held corporation: Robert Lobato; his sister, Carolyn Lobato-Bleidt; and her husband, Carwin Bleidt. Robert is the former president of Limited Gaming, Carolyn is the current president and majority shareholder of Limited Gaming, and Carwin is the former president and former majority shareholder of Limited Gaming.
By way of background, Carwin owned all 11 million shares of Limited Gaming in 1991. In the fall of 1991, Robert was hired to be the president of Limited Gaming. Robert claimed that in return for running the company, he was supposed to get one-half of Carwin's stock (less one share) and the same compensation as Carwin. Carwin, however, refused to transfer the stock. Carwin also sold some company property for a profit exceeding 7 million dollars but did not share the profit with Robert.
Robert left the company in June of 1992. A month later, he filed suit in Colorado against Carwin and Limited Gaming. Robert sought a portion of the profit generated by the sale of the property as damages for the breach of his employment agreement.
On December 13, 1993, while the Colorado lawsuit was proceeding, Carwin transferred 5,100,001 shares of Limited Gaming to Carolyn. This transfer gave Carolyn majority control of the corporation. To accomplish the transfer, Carwin surrendered his 11 million shares to the corporation and then reissued shares to himself and to his wife. The new shares contained a "buy back" restriction.[1]
Three months later, Robert's lawsuit against Carwin went to trial. In April 1994, Robert obtained a judgment in Colorado against Carwin for over 3.4 million dollars.
A week later, the board of directors[2] of Limited Gaming agreed to accept a pledge of Carwin's shares as security for a recent "loan" of $812,000. Carwin also tendered his *433 resignation as president and Carolyn was appointed president. Carwin continued, however, to serve as chairman at an annual salary of $144,000. The board also approved so-called "golden parachutes" or severance agreements for the corporate officers. These agreements provided that all officers of Limited Gaming would receive three years compensation if control of the corporation changed. A few days later, Carwin executed an agreement pledging his shares as security for his loan.
In the meantime, the Bleidts moved to Florida. Robert filed proceedings supplementary here to try to collect on his Colorado judgment. On September 1, 1994, the Colorado judgment was domesticated. At this time, it appeared that the only asset still owned by Carwin was his stock in Limited Gaming.
A few weeks later, on September 17, 1994, Limited Gaming's board of directors approved a resolution recommending the sale of additional shares of stock and approving the severance agreements. At a shareholders' meeting on October 1, 1994, the shareholders voted to increase the number of shares from 21 million to 120 million. The consideration for the shares was 1/100 of a cent. Carolyn purchased 97 million shares for about $9,700. This resulted in Carolyn owning about 88 percent of the voting shares.
A month later, the Florida court invalidated Carwin's transfer of stock to Carolyn and the agreement pledging Carwin's remaining stock to the company as security for the $812,000 loan. The court required that approximately 11 million shares be surrendered to the Volusia County Sheriff. Robert purchased the shares, which he believed to be worth about 3 million dollars. However, Carolyn told him that the 11 million shares represented only 8 percent of the company and were worth about one-quarter of a million dollars. Robert filed a motion for the appointment of a receiver, which was granted.
Robert also filed an amended supplemental petition for relief to set aside the shareholders' agreements containing the buy back restrictions, the issuance of the additional shares, and the golden parachute severance agreements.[3] At the hearing on this petition, Carwin, Carolyn and the minority shareholders acknowledged that the stock issuance and severance agreements were designed to prevent Robert from taking over the corporation. They claimed, however, that these actions were to protect the corporation from Robert, and not to prevent Robert from collecting on his judgment.
The court below found that the stock issuance was a classic stock watering device designed to prevent Robert from gaining control of Limited Gaming. The court also found that Limited Gaming's actions were fraudulent and done simply to insure that Robert would get nothing if he obtained the stock. The court voided the issuance of the additional stock and the golden parachute severance agreements. The court also ruled that the stock restriction agreement did not apply to the stock formerly held by Carwin and now owned by Robert.
On appeal, the Bleidts contend that the matter of the stock issuance has already been litigated in the Colorado and the initial Florida proceedings. The Bleidts argue that its consideration now constitutes an impermissible "splitting of causes of action" and is barred by the doctrine of res judicata.
The rule against splitting causes of action provides that all damages sustained by a party as a result of a single wrongful act must be claimed and recovered in one action. Dade County v. Matheson, 605 So.2d 469 (Fla. 3d DCA 1992). If a party drops a claim in the first action and then later seeks to maintain a separate second action on the abandoned claim, the rule against splitting causes of action precludes that party from maintaining the second suit. Id.
Res judicata bars a subsequent suit between the same parties based upon the same cause of action. The initial judgment is conclusive as to all matters that were or could have been raised. Gordon v. Gordon, 59 So.2d 40 (Fla.), cert. denied, 344 U.S. 878, 73 *434 S.Ct. 165, 97 L.Ed. 680 (1952); Markel v. Dizney, 534 So.2d 1205 (Fla. 5th DCA 1988). For res judicata to bar the subsequent action, four identities must be present: 1) identity of the thing sued for, 2) identity of the cause of action; 3) identity of persons and parties; and 4) identity of the quality or capacity of the persons for or against whom the claim is made. Husky Industries, Inc. v. Griffith, 422 So.2d 996 (Fla. 5th DCA 1982). A judgment is not res judicata as to rights which were not in existence and which could not have been litigated at the time the prior judgment was entered. Wagner v. Baron, 64 So.2d 267 (Fla.1953).
The rule against splitting causes of action and the doctrine of res judicata do not apply here because the causes of action are different and because the actions had not occurred or were not discovered until after the Colorado and the initial Florida proceedings. In the Colorado lawsuit, Robert filed suit against Carwin and Limited Gaming for breach of his employment contract. When required to elect remedies, Robert chose to proceed against Carwin individually and not Limited Gaming because Carwin controlled the corporation. Assuming that his shares in the closely held corporation would be worthless to him, Robert sought damages in the form of one-half of the profits realized by the company while he was its president.
In the Florida proceedings brought to collect on his judgment, Robert first sought to domesticate the Colorado judgment. He also sought injunctive relief. In a hearing on this request, the trial judge advised Robert that few creditors are successful in piercing the corporate veil, and that he would impose a substantial bond in the event that an injunction was issued freezing the assets of the corporation. Robert then withdrew his request for injunctive relief.
This hearing was held in May 1994. Limited Gaming did not increase its shares from 21 million to 120 million until October 1994, several months later. Furthermore, Robert did not learn about the golden parachutes until after he purchased Carwin's shares at the sheriff's sale and obtained discovery from the corporation. Since these events occurred after the Colorado lawsuit and the initial Florida proceedings, the legal issues arising out of them constitute separate and distinct causes of action. A lawsuit based on these causes of action is not barred by res judicata nor does it involve an impermissible splitting of a cause of action. See The Florida Bar v. Gentry, 447 So.2d 1342 (Fla.1984); Rajsfus v. Fabri, 535 So.2d 690 (Fla. 3d DCA 1988).
The Bleidts next contend that the challenged transactions cannot be deemed fraudulent transfers under section 56.29 (proceedings supplementary) or section 726.101 (fraudulent transfers). The Bleidts argue that the directors of Limited Gaming were simply exercising prudent "business judgment" in issuing additional shares, providing for a severance package for its officers and placing the buy back restriction on its stock.
The Bleidts are correct that under the "business judgment" rule, a board of directors is given wide discretion to make decisions and a court generally will not substitute its judgment for that of the directors. International Insurance Co. v. Johns, 874 F.2d 1447 (11th Cir.1989). It is also true that a corporation is an entity separate from its directors and shareholders and ordinarily the corporate veil will not be pierced. See Riley v. Fatt, 47 So.2d 769 (Fla.1950). However, the deference given to the actions of the directors and the actions of the corporation presuppose that these actions are taken in good faith and not for a fraudulent purpose. Riley, 47 So.2d at 773. The rule is that the corporate veil will not be pierced unless it is shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them. International Insurance Co., 874 F.2d at 1458, n. 20 (absent any wrongdoing, the board's business decisions should not be subject to in depth legal scrutiny).
Here, Carwin divested himself of all his assets during the pendency of the Colorado proceedings. After the lawsuit by Robert was filed and within three months of the trial, Carwin transferred the majority of his shares to his wife. This transfer resulted in the stock (for the first time) being encumbered by the buy back restrictions. This transfer was invalidated and the shares were sold to Robert at the sheriff's sale. Thus *435 Robert owns the shares without any restriction.
The "golden parachute" severance agreements were enacted several days after Robert obtained a judgment for 3.4 million dollars against Carwin. If executed, the golden parachutes would deplete the corporation of millions of dollars. The additional stock was issued several months later while the Florida court was deciding whether Carwin's pledge agreement and transfer of stock to his wife was fraudulent. The stock issuance clearly reduced the value of Carwin's shares, which was the only asset on which Robert could levy.
Section 56.29(6)(b) provides that whenever any gift, transfer, assignment or other conveyance of personal property has been made or contrived by the defendant to delay, hinder or defraud creditors, the court shall order the gift, transfer, assignment or other conveyance to be void and direct the sheriff to take the property to satisfy the execution. Subsection (9) provides that the court may enter any orders required to subject property or property rights of any defendant to execution. The Florida court found that the actions of Carwin and Carolyn were done with the intent to hinder Robert from collecting on his Colorado judgment. The evidence clearly supports this conclusion. See Wieczoreck v. H & H Builders, Inc., 450 So.2d 867 (Fla. 5th DCA 1984), certified question answered, 475 So.2d 227 (Fla.1985), receded from on other grounds, Bleidt v. Lobato, 664 So.2d 1074 (Fla. 5th DCA 1995).
Finally, the Bleidts complain that the order below contains findings which misstate the evidence and grants relief beyond Robert's pleadings. In his amended supplemental petition, Robert asked the court to invalidate the shareholders' agreements, the issuance of the additional stock, and the golden parachutes. The relief granted was well within the scope of these pleadings.
The Bleidts' argument that the relief granted was "too broad" overlooks the principle that proceedings supplementary are designed to afford broad relief to judgment creditors. Wieczoreck. The Bleidts also ignore the fact that Carwin and Carolyn controlled the actions of Limited Gaming. While deference is given to actions of corporations taken in good faith, the evidence supports the conclusion that the actions of Carwin and Carolyn in watering down the stock, imposing the stock restrictions, and in enacting multi-million dollar golden parachutes were all designed solely to prevent Robert from collecting on his judgment.
AFFIRMED.
GOSHORN and HARRIS, JJ., concur.
NOTES
[1] Carwin's original shares were not subject to any restrictions. However, the corporation later increased the number of shares. A restriction was then placed on the stock that the corporation had the right to buy back the shares.
[2] The board consisted of Carolyn, Carwin, Carwin's daughter and a minority shareholder.
[3] Robert did not find out about the golden parachutes until 1995 when he started receiving documents from Limited Gaming which he had demanded as a shareholder.