759 So.2d 732 (2000)
ACADIA PARTNERS, L.P., Appellant/Cross-Appellee,
v.
Thomas N. TOMPKINS, et al., Appellees/Cross-Appellants.
No. 5D98-2738.
District Court of Appeal of Florida, Fifth District.
May 26, 2000.
*734 Stuart H. Singer, Richard Brener, Rima Y. Mullins of Kirkpatrick & Lockhart, L.L.P., Miami, and Patricia A. Dean, John C. Massaro, Nicholas I. Porritt of Arnold & Porter, Washington, D.C., for Appellant/Cross-Appellee.
Peter Q. Bassett, Rebecca M. Lamberth, and H. Douglas Hinson of Alston & Bird, L.L.P., Atlanta, and Marcia K. Lippincott of Marcia K. Lippincott, P.A., Lake Mary, for Appellee/Cross Appellant, Thomas N. Tompkins.
John Edwin Fisher, Chris Ballentine, and Jamie B. Moses of Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap, P.A., for Appellee/Cross-Appellant, Marcia K. Tompkins.

ON MOTION FOR REHEARING
ANTOON, C.J.
Cross-appellant Thomas N. Tompkins' motion for rehearing is denied. However, we withdraw our previous opinion issued March 31, 2000, and substitute the following opinion in order to correct typographical errors therein.
Acadia Partners, L.P., sued Thomas and Marcia Tompkins in tort in an effort to recover $30 million which a jury had awarded Acadia in its prior breach of contract suit against Tompkins Investment Group Incorporated (TIGI). In this action, Acadia sought to pierce TIGI's corporate veil and to impose liability for TIGI's breach of contract against the Tompkinses personally. The jury found in favor of Acadia, and the trial court entered final judgment in accordance with the jury's verdict. Acadia appeals, arguing that the trial court erred in crediting pretrial settlements against the judgment and in calculating the rate of interest on the judgment. The Tompkinses cross-appeal, arguing that the trial court erred in denying Ms. Tompkins' motion for new trial and in denying the Tompkinses' motion to determine the value of certain stock. We affirm the trial court's judgment in all respects.
A description of the historical background of this case is necessary in order to understand the issues raised on appeal.[1] TIGI was a Delaware corporation formed by the Tompkinses. TIGI's primary business was constructing residential buildings in Florida. Acadia is a limited partnership composed of financial institutions including American Express, John Hancock, Xerox Credit, Equitable Life Insurance Co., Mitsubishi, Bankque of Paribas, Wells Fargo, and Shearson Lehman. In 1987 and 1988, through a series of loan transactions, TIGI borrowed a total of $35 million from Acadia. In late 1989, TIGI ceased making payments due under the terms of the loan agreements.
After TIGI's default, the parties' attorneys tried to restructure the loans. When *735 these efforts failed, Acadia filed a breach of contract action against TIGI, Case No. CI 91-319 (Case 319), and a tort action against the Tompkinses individually, Case No. CI 97-320 (Case 320). In Case 319 Acadia sought to recover for TIGI's alleged breach of the parties' credit agreements. TIGI counterclaimed alleging breach of an interim agreement between the parties. Case 320 was held in abeyance pending disposition of Case 319.
Case 319 eventually went to trial. The jury awarded Acadia $48,785,500, which amount included the $35 million in unpaid principal plus prejudgment interest, and also returned a verdict in favor of TIGI on its counterclaim in the amount of $18,785,500. Thus, the net result in Case 319 was a $30,000,000 verdict in favor of Acadia.[2] The trial court entered judgment in accordance with the jury's verdict and appointed a receiver to manage TIGI.
After final judgment was entered in Case 319, Acadia amended its complaint in Case 320 by adding a claim seeking to pierce TIGI's corporate veil so that it could recover the damages sustained by Acadia as a result of TIGI's breach of contract from the Tompkinses personally. The complaint named as defendants Mr. Tompkins, chairman of the board of directors and chief executive officer of TIGI, and Ms. Tompkins, vice-chairman of the board of directors of TIGI. Acadia sought damages against the Tompkinses based on theories of fraud, fraudulent transfer of the loan funds, statutory claims, tortious interference with contract, negligence, and negligent misrepresentation. The complaint also named additional defendants including TIGI's accountant, Arthur E. Lipson, and TIGI's general counsel, Foley & Lardner (Foley). Acadia alleged that Mr. Lipson and Foley had conspired to devise a plan pursuant to which Mr. and Ms. Tompkins could obtain capital from Acadia for their other real estate businesses as well as their personal use while keeping their true financial condition concealed. Additionally, the complaint alleged that Mr. Lipson and Foley had knowingly made false representations of material facts which fraudulently induced Acadia (1) to enter into credit agreements; (2) to lend money to TIGI; and (3) to forbear from enforcing its rights under the agreements and seeking return of its money. The causes of action asserted against Mr. Lipson and Foley included fraud, aiding and abetting fraudulent transfer, conspiracy to defraud, tortious interference with contract, negligent misrepresentation, and breach of fiduciary duty.
Mr. Lipson and Foley settled prior to trial. As a result, the matter proceeded to trial solely against the Tompkinses. Upon review of the evidence, the jury found that Mr. Tompkins had fraudulently transferred $2,683,900 of the funds borrowed from Acadia for his personal use. The jury also found that TIGI's corporate veil should be pierced. In calculating the Case 320 final judgment, the trial court granted setoffs for the amounts received by Acadia as the result of its pretrial settlements. This appeal followed.

I. Setoffs of Pretrial Settlements
Prior to trial in Case 320, Acadia settled its claim against Mr. Lipson and he was dismissed from the case. When the trial court later permitted Acadia to amend its complaint to add a punitive damage claim against Foley and several of the other defendants, Acadia reached a settlement with Foley and the firm was also dismissed from the case.
Acadia had also threatened legal action against First Union National Bank of Florida (First Union) in relation to Case 320. Basically, the theory of that claim was that First Union had agreed with Foley and the Tompkinses to use $6 million of the loan proceeds received from *736 Acadia to pay personal debts the Tompkinses owed First Union. Acadia further claimed that First Union had failed to transfer collateral which had been pledged by the Tompkinses in an agreement with Acadia. However, before any pleading against First Union was filed, First Union executed a settlement and release whereby First Union agreed to pay Acadia $1 million cash, to assign Acadia $3,116,000 in mortgage receivables, and to transfer to Acadia 900,606 shares of Class A TIGI stock.
In calculating the Case 320 final judgment, the trial court determined that section 46.015(2) of the Florida Statutes required that the Tompkinses receive setoffs for the funds Acadia received pursuant to its pretrial settlements because the settlements were for the single loss Acadia suffered as a result of TIGI's default on its loan obligation. Section 46.015(2) of the Florida Statutes (1997), provides in relevant part:
46.015 Release of parties.
(1) A written covenant not to sue or release of a person who is or may be jointly and severally liable with other persons for a claim shall not release or discharge the liability of any other person who may be liable for the balance of such claim.
(2) At trial, if any person shows the court that the plaintiff, or his or her legal representative, has delivered a written release or covenant not to sue to any person in partial satisfaction of the damages sued for, the court shall set off this amount from the amount of any judgment to which the plaintiff would be otherwise entitled at the time of rendering judgment.

(Emphasis added).
Acadia argues that the setoff provisions of section 46.015(2) apply only if the settling parties could have been found to have been jointly and severally liable with the party requesting setoff. Applying this construction of the statute, Acadia maintains that the Tompkinses were not entitled to receive setoffs in amounts equal to the settlements reached because the settling tortfeasors were not, and could not have been, found jointly and severally liable with the Tompkinses on Acadia's corporate veil piercing claim. More specifically, Acadia argues that under the facts of this case there could have been no finding of joint and several liability between the Tompkinses and the settling tortfeasors because, while Acadia sued the Tompkinses on a theory of piercing the corporate veil, Acadia asserted various other tort theories against Mr. Lipson, Foley and First Union.
Joint and several liability among multiple tortfeasors exists when the tortfeasors, acting in concert or through independent acts, produce a single injury. See Smith v. Department of Ins., 507 So.2d 1080, 1090 (Fla.1987). This principle is set forth in section 875 of the Restatement (Second) of Torts (1979), which provides:
§ 875. Contributing TortfeasorsGeneral Rule
Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.
Additionally, section 876 provides further:
§ 876. Persons Acting in Concert
For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
*737 Restatement (Second) of Torts § 876 (1979).
Acadia's complaint makes it clear that, in suing the various tortfeasors, Acadia was seeking to collect for a single lossthe outstanding balance due on the defaulted note. To that end, in its complaint Acadia alleged that Mr. Lipson had served as TIGI's chief financial officer and was a member of TIGI's board of directors and that Egerton van den Berg was a partner of the Foley law firm and also a member of TIGI's board of directors. The complaint further alleged that Mr. Lipson and Foley in their capacity as board members had made misrepresentations and conspired to devise a plan to fraudulently induce Acadia to loan funds to TIGI so the Tompkinses could use the funds for their personal use. These allegations set forth a viable basis for joint and several liability under the terms described in section 876 of the Restatement. Accordingly, the trial court was correct in granting setoffs for the settlements reached with Mr. Lipson and Foley.[3]
Whether the Tompkinses were entitled to receive a setoff for the First Union settlement requires additional analysis since technically First Union was never named a party defendant in Case 320. Although Acadia did not name First Union as a defendant in the Case 320 complaint, the complaint did refer to First Union's involvement in the conspiracy. In that regard, the complaint asserted that, as a condition precedent to the Acadia loan, the Tompkinses had agreed to transfer mortgage receivables owned personally by them to TIGI free and clear of debt, the debt to be retained by the Tompkinses. The complaint then explained that the Tompkinses and Foley "secretly agreed with First Union that once TIGI obtained the loan from Acadia, TIGI would use Acadia's money to pay off the Tompkinses' personal loans or TIGI would encumber TIGI assets to provide collateral for these personal loans." Faced with these allegations, First Union settled, thus avoiding becoming a named defendant in the lawsuit. Under these circumstances, the trial court properly awarded a setoff in the amount of First Union's settlement with Acadia because clearly those funds were paid in recognition of the bank's complicity in TIGI's default on Acadia's loan.
The trial court's decision to set off the monies received under Acadia's settlement with First Union created an additional issue that of determining the dollar amount of the setoff. This determination was problematic because it required the court to establish, among other things, a value for the 900,606 shares of Class A TIGI stock which First Union transferred to Acadia pursuant to the settlement agreement. After the jury entered its verdict against Mr. and Ms. Tompkins in the 320 action, the trial court held that the value of the Class A TIGI stock would "be determined at a jury trial to be held in the future." That trial was held in July 1998, and the jury determined the fair market value of the shares was $1,800,000. The trial court applied this figure to its setoff calculation. Acadia challenges this ruling, *738 arguing theories of res judicata and collateral estoppel. More particularly, Acadia asserts that the value of the Class A TIGI shares had already been established by the TIGI receivership court; therefore, the court erred in submitting the issue to a jury for resolution.
The doctrine of res judicata applies to bar actions that have already been adjudicated. In order "[f]or res judicata to bar the subsequent action, four identities must be present: 1) identity of the thing sued for; 2) identity of the cause of action; 3) identity of persons and parties; and 4) identity of the quality or capacity of the persons for or against whom the claim is made." Lobato-Bleidt v. Lobato, 688 So.2d 431, 434 (Fla. 5th DCA 1997) (citing Husky Indus., Inc. v. Griffith, 422 So.2d 996 (Fla. 5th DCA 1982)). Here, the trial court properly recognized that the TIGI receivership proceeding and the Case 320 litigation fail this identity test because, among other things, the receivership proceeding did not involve the adjudication of a contested claim. Instead, the role of the receivership court was simply to develop a plan for the orderly disposition of claims against TIGI.
Similarly, in order for the doctrine of collateral estoppel to apply there must be an identical issue presented in a prior proceeding; the issue must have been a critical and necessary part of the prior determination; there must have been a full and fair opportunity to litigate that issue; the parties in the two proceedings must be identical; and the issues must have been actually litigated. See Department of Health & Rehabilitative Servs. v. B.J.M., 656 So.2d 906 (Fla.1995). Here, the trial court properly determined that the doctrine of collateral estoppel could not be applied in Case 320 with regard to the value of the Class A TIGI stock because the value of the shares was not at issue in the receivership proceeding.

II. Crediting Settlements as of the Date the Monies were Paid
Next, Acadia argues that in calculating the final judgment, the trial court erred in crediting each settlement as of the date the settlement was paid, contending that instead the settlements should have been credited as of the date the final judgment was entered in Case 320. To support this claim Acadia relies on the wording of section 46.015(2) of the Florida Statutes (1997), which provides that a setoff is to be "from the amount of any judgment to which the plaintiff would be otherwise entitled at the time of rendering judgment." (Emphasis added). The determination of this issue, of course, affects the amount of post judgment interest Acadia is entitled to receive.
It appears that this precise issue has not yet been addressed by any Florida appellate court. However, the Fourth District Court, in Centex-Rooney Construction Co., Inc. v. Martin County, 706 So.2d 20 (Fla. 4th DCA), rev. denied, 718 So.2d 1233 (Fla.1998), has applied a setoff under section 46.015(2), Florida Statutes (1997), by deducting the amount of the setoff before calculating the interest due on the damage award. There, the jury returned a verdict in the amount of $11,550,000 against Centex and reduced the verdict amount by the amount the plaintiff had already received from another defendant. See id. at 25. It was only after the court reduced the settlement amount from the judgment that the court calculated the interest due on the damages. Although not explicitly stated, it is obvious that the court's ruling prevented the plaintiff from collecting interest on that part of the judgment that was subject to setoff. The trial court's ruling in the instant case is consistent with this rationale because, by deducting the settlement amounts as of the date they were paid, the trial court properly prevented Acadia from collecting interest on the amount of money received from the settling parties for the period of time between the date of the respective settlements and the date the final judgment was entered in Case 320. To have done otherwise would *739 have resulted in an award of postjudgment interest on money which had already been received by Acadia. In affirming the trial court's ruling, we recognize that the purpose of the setoff provision contained in section 46.015(2) is to prevent an award of double damages and that this purpose would be obviated if we were to construe the statute to mean that Acadia could collect and hold the settlement monies while at the same time accruing interest on the judgment.

III. Calculation of Interest
Finally, Acadia argues the trial court erred in imposing a fluctuating interest rate to the judgment entered in Case 320 instead of the 12% interest rate originally imposed in the judgment entered in Case 319. We again disagree.
Over the course of Acadia's litigation to recover its loss on its loan to TIGI, the law controlling the rate of postjudgment interest changed. When the Case 319 final judgment was entered in 1992, section 55.03, Florida Statutes (1991), provided in relevant part:
55.03 Judgments; rate of interest, generally.
(1) A judgment or decree entered on or after October 1, 1981, shall bear interest at the rate of 12 percent a year unless the judgment or decree is rendered on a written contract or obligation providing for interest at a lesser rate, in which case the judgment or decree bears interest at the rate specified in such written contract or obligation.
Section 55.03 was amended in 1994 to provide for a fluctuating interest rate for all judgments entered after January 1, 1995. See Ch. 94-239, § 8, at 1790, Laws of Fla. This section currently provides:
55.03 Judgments; rate of interest, generally.
(1) On December 1 of each year beginning December 1, 1994, the Comptroller of the State of Florida shall set the rate of interest that shall be payable on judgments or decrees for the year beginning January 1 by averaging the discount rate of the Federal Reserve Bank of New York for the preceding year, then adding 500 basis points to the averaged federal discount rate. The Comptroller shall inform the clerk of the courts and chief judge for each judicial circuit of the rate that has been established for the upcoming year. The initial interest rate established by the Comptroller shall take effect on January 1, 1995, and the interest rate established by the Comptroller in subsequent years shall take effect on January 1 of each following year. Judgments obtained on or after January 1, 1995, shall use the previous statutory rate for time periods before January 1, 1995, for which interest is due and shall apply the rate set by the Comptroller for time periods after January 1, 1995, for which interest is due. Nothing contained herein shall affect a rate of interest established by written contract or obligation.
The trial court applied the fluctuating rate of interest because the Case 320 judgment was entered in August 1998.
Acadia argues that the trial court erred in applying the amended statute because the judgment entered in Case 320 was merely an enforcement of the judgment entered in Case 319 and therefore the 12% statutory interest rate in effect in 1992 should have been applied, citing Beverly EnterprisesFlorida, Inc. v. Spilman, 689 So.2d 1230, 1231 (Fla. 5th DCA 1997). Spilman held that the 1994 amendment to section 55.03 does not affect the legal rate of interest accruing on a final judgment entered before the effective date of the amendment. However, Acadia's argument evidences its misapprehension of the nature of the instant case. Had Case 320 been an action under section 56.29, Florida Statutes (1997), for proceedings supplementary to execution, we would agree that the 12% interest rule would control. However, Case 320 was not litigated as a traditional postjudgment enforcement proceeding. Instead, Case 320 was an independent *740 tort action. Accordingly, the trial court properly calculated the rate of interest in accordance with the terms of the amended statute.

IV. Valuation of Class B TIGI Stock
On cross-appeal, the Tompkinses argue that the trial court erred in denying their motion to determine the value of the Class B TIGI stock which was transferred from TIGI to the receiver. We conclude that the Tompkinses are precluded from raising this issue on appeal because the same argument was presented to and rejected by the trial court in Case 319 and the court's ruling thereon was not appealed. See University Hosp., Ltd. v. State, Agency for Health Care Admin., 697 So.2d 909 (Fla. 1st DCA 1997).

V. Valuation of Class A TIGI Stock for Purposes of Calculating Setoff
The Tompkinses further argue that the trial court erred in allowing the jury to consider the judgment which was entered in Case 319 when determining the value of the Class A TIGI stock which was transferred to Acadia by First Union pursuant to their settlement agreement. However, they fail to cite to any case law or statutory authority to support this argument.
In calculating the amount of the setoff to be credited for First Union's settlement agreement, the trial court was required to obtain a valuation of 900,606 shares of Class A TIGI stock which First Union transferred to Acadia in 1993 pursuant to the terms of the agreement. The question of valuation was presented to a jury for a determination of the value of that stock at the time it was transferred. Importantly, at the time the stock transfer was completed, TIGI owed Acadia $30 million plus postjudgment interest on the Case 319 judgment and the court permitted the jury to consider that evidence.
Under the circumstances presented in this case, the trial court properly determined that the outstanding judgment debt needed to be considered by the jury in order to properly value the Class A TIGI stock. In determining the value of stock, the "`ratio of assets to liabilities, funded debt, character of assets, value of assets, volume of business, impermanence of the business, attractiveness of the stock to investors, stability of net income from the assets, or any other impediments to true taxable value'" are proper considerations. Landon v. Metropolitan Dade County, 280 So.2d 714, 716 (Fla. 3d DCA 1973) (quoting Root v. Wood, 155 Fla. 613, 21 So.2d 133 (1945)).

VI. Ms. Tompkins' Motion For New Trial
Finally, Ms. Tompkins argues that she is entitled to receive a new trial because the jury entered an inconsistent verdict against her in that the jury did not find Ms. Tompkins personally liable on any of Acadia's individual fraud claims, yet the jury found in favor of Acadia under its piercing the corporate veil claim. However, contrary to Ms. Tompkins' argument, the verdicts are not inconsistent. The elements of Acadia's claim to pierce the corporate veil were separate from the elements of the other causes of action submitted to the jury. Accordingly, there was no impediment to a finding of liability on the corporate veil claim even where no liability was assessed on the other claims.
Having found no merit in any of the issues raised on appeal or cross-appeal, we affirm the final judgment entered by the trial court.
AFFIRMED.
HARRIS and PETERSON, JJ., concur.
NOTES
[1] This is the fourth time that issues in this case have been before this court. See Tompkins v. Acadia Partners, L.P., 702 So.2d 1340 (Fla. 5th DCA 1997); Acadia Partners, L.P. v. Tompkins, 673 So.2d 487 (Fla. 5th DCA), rev. denied, 678 So.2d 340 (Fla.), and review denied sub nom., Foley & Lardner v. Acadia Partners, L.P., 678 So.2d 338 (Fla.1996); Tompkins Inv. Group, Inc. v. Acadia Partners, L.P., 626 So.2d 700 (Fla. 5th DCA 1993).
[2] This court affirmed Case 319. See Tompkins Inv. Group, Inc. v. Acadia Partners, L.P., 626 So.2d 700 (Fla. 5th DCA 1993).
[3] Acadia also argues that it was error for the trial court to grant setoff of Foley's settlement because there was a lack of commonality of damages. This argument is based on Acadia's assertion that it had a viable punitive damage claim against Foley but not against the Tompkinses. In other words, Acadia asserts that the trial court should not have set off the funds received pursuant to its settlement with Foley because the court could not have determined whether the amounts paid by Foley were for punitive damages or for compensatory damages resulting from TIGI's default on the loan. Review of Foley's settlement agreement reveals that no allocation was specified for the settlement of Acadia's punitive damage claim. As a result, there was no practical way for the trial court to allocate the amounts to be set off for punitive and compensatory damages because such an exercise would have been entirely speculative. It follows that, based upon this record, Acadia is unable to establish its claim of lack of commonality of damages. See Continuum Condominium Ass'n, Inc. v. Continuum VI, Inc., 549 So.2d 1125, 1126 (Fla. 3d DCA 1989).