Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC, 2018 NCBC 55.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 1783

INSIGHT HEALTH CORP. d/b/a
INSIGHT IMAGING,

        Plaintiff,

v.

MARQUIS DIAGNOSTIC IMAGING
OF NORTH CAROLINA, LLC;
MARQUIS DIAGNOSTIC IMAGING,
LLC; JOHN KENNETH LUKE; and
GENE VENESKY,

        Defendants.

**OPINION AND JUDGMENT**

1.    **THIS MATTER** is before the Court to resolve certain post-trial matters in the above-captioned case.

2.    The jury trial in this case began on November 6, 2017 and concluded on November 15, 2017. The jury returned a verdict in favor of Plaintiff Insight Health Corporation ("Insight") on all issues. During the trial, counsel for both sides agreed to submit post-trial briefs on Insight's request that the Court pierce the corporate veils of Defendants Marquis Diagnostic Imaging of North Carolina ("MDI-NC") and Marquis Diagnostic Imaging, LLC ("MDI"). The Court reserved the right to make its decision following briefing without a hearing.

3.    On January 24, 2018, Insight filed a Motion for Prejudgment Interest, Attorneys' Fees, and Costs (the "Motion for Fees and Interest").

4.    Briefing on Insight's request that the Court pierce the corporate veil and Insight's Motion for Fees and Interest is now complete, and the Court elects, in its discretion and pursuant to Rule 7 of the General Rules of Practice and Procedure for

the North Carolina Business Court, to decide these issues without a hearing. For the reasons set forth herein, the Court pierces the corporate veils of MDI-NC and MDI and **ENTERS JUDGMENT**, with postjudgment interest at the legal rate, against Defendants MDI-NC, MDI, John Kenneth Luke ("Luke") and Gene Venesky ("Venesky") consistent with the jury's verdict. The Court also **GRANTS** Insight's Motion for Fees and Interest **in part** as to prejudgment interest and **DEFERS ruling on** Insight's request for attorneys' fees and costs and will address those matters by separate order.

> *Smith Moore Leatherwood, LLP, by Marcus C. Hewitt and Jeffery R. Whitley, for Plaintiff Insight Health Corporation d/b/a Insight Imaging.*
>
> *Roberts & Stevens, P.A., by Wyatt S. Stevens, Ann-Patton Hornthal, and John D. Noor, for Defendants Marquis Diagnostic Imaging of North Carolina, LLC, Marquis Diagnostic Imaging, LLC, John Kenneth Luke, and Gene Venesky.*

Bledsoe, Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

5. The Court has discussed the claims and allegations involved in this action at length in prior opinions, including those reported at *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C.*, 2017 NCBC LEXIS 91 (N.C. Super. Ct. Oct. 3, 2017); and *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C.*, 2017 NCBC LEXIS 14 (N.C. Super. Ct. Feb. 24, 2017). In the succeeding paragraphs, the Court sets forth the uncontested facts and procedural history pertinent to the issue at bar, as well as those facts determined by the jury at trial.

A.    Factual Background

6.    Insight is a corporation engaged in the business of leasing and operating MRI scanners. *Insight Health Corp.*, 2017 NCBC LEXIS 14, at *3. The contract at the center of this case was an MRI lease agreement (the "MRI Agreement") Insight entered into with MDI-NC, a limited liability company ("LLC") organized in North Carolina by MDI for the purpose of doing business within this State. *Id.* at *2–3. MDI, an LLC organized under Delaware law, is the sole member of MDI-NC and several related entities, including Marquis Diagnostic Imaging of Georgia, LLC and Marquis Diagnostic Imaging of Arizona, LLC. *Id.* at *3. Defendants Luke and Venesky each own a 49.5% membership interest in MDI. *Id.* Luke served as CEO and President of MDI and CEO of MDI-NC. *Id.* Venesky was a manager of both MDI and MDI-NC. *Id.*

7.    Prior to the events described herein, MDI-NC operated an imaging center in Asheville, North Carolina. *Id.* In 2011, Insight approached Luke and Venesky about purchasing MDI-NC's assets. *Id.* Approximately a year later, Insight and MDI-NC entered into a non-binding Letter of Intent (the "LOI") in connection with the proposed asset purchase. *Id.* at *4.

8.    While still negotiating the proposed asset purchase, Insight and MDI-NC entered into the MRI Agreement. *Id.* at *5. Under this agreement, Insight provided a Siemens Espree MRI scanner, support staff, and other services to MDI-NC for a monthly payment—starting at $79,000 per month for the first year and increasing $1,000 per month in each subsequent year for the MRI Agreement's seven-year term.

*Id.* at *5–6. The MRI Agreement did not contain any reference to the ongoing asset purchase negotiations and stated that it "constitute[d] the entire agreement between the parties pertaining to the subject matter [therein] and supersede[d] all prior and contemporaneous agreements, representations, and understandings . . . oral or written." *Id.* at *6.

9.     After executing the MRI Agreement, the parties amended the LOI to state that MDI-NC would be released from the MRI Agreement if the asset purchase was completed. *Id.* No written provision or amendment of the LOI indicated that Insight would release MDI-NC from the MRI Agreement if the asset purchase did not occur. *Id.*

10.     A series of events caused the contemplated asset purchase to fail. In July 2013, MDI's CFO, Tom Gentry ("Gentry"), sent MDI-NC's updated profit and loss statements to Insight. *Id.* When Insight updated its financial analysis of MDI-NC with these numbers, it concluded that its original offer for MDI-NC's assets, $2.1 million, was too high. *Id.* at *7. After receiving additional information and again updating its financial analysis of MDI-NC, Insight advised Gentry that it had erred in calculating its initial offer price. *Id.* Gentry informed Insight that MDI-NC would sell its assets for $1.4 million. *Id.* at *7–8. Insight countered with a $250,000 offer. *Id.* at *8. The negotiations stalled after the parties failed to reach an agreement. *Id.* at *8.

11.     MDI-NC subsequently sold its assets to another company, and, on November 15, 2013, the Asheville imaging center run by MDI-NC ceased its

operations. *Id.* Concurrently, MDI-NC stopped using Insight's MRI scanner and made no payments on the MRI Agreement for the period after that date. *Id.* Evidence introduced at trial tended to show that MDI-NC continued to make payments to other creditors for some time after ceasing operations and that cash was transferred from MDI-NC to MDI, Luke, Venesky, and other entities which Luke and Venesky managed or controlled. These cash transfers were not memorialized in loan documents or effectuated by any other formal process.

### B. Procedural Background

12. Insight commenced this action against Defendants on April 24, 2014. Insight's operative complaint, its Amended Complaint, was filed on December 4, 2014. Insight alleged that Defendants caused MDI-NC to breach the MRI Agreement by ceasing payments for the period after November 15, 2013. Insight also alleged that Luke and Venesky wound up MDI-NC while using the money obtained from MDI-NC's asset sale to pay the debts of other LLCs they owned or managed—debts on which Luke and/or Venesky were obligated by personal guarantees. Insight alleged that it was not paid its pro rata share of these sums in violation of its legal rights as a creditor of an LLC winding-up its affairs.

13. Based on these allegations, Insight brought a claim for breach of contract against MDI-NC, claims against all Defendants for unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, fraudulent transfer under N.C. Gen. Stat. § 39-23 *et seq.*, and wrongful distribution and personal liability under N.C. Gen. Stat.

§ 57C-4-06 *et. seq.*, and claims against Luke and Venesky individually for breach of fiduciary duty and constructive fraud.[1] (Am. Compl. 12–24, ECF No. 61.)

14. In addition to these six causes of action, Insight also requested that the Court pierce the corporate veils of MDI-NC and MDI to hold Luke and Venesky liable for MDI-NC's breach of contract, alleging that the two LLC's were mere instrumentalities of the two individuals. (Am. Compl. 21–22.)

15. In response, MDI-NC asserted various affirmative defenses and counterclaims against Insight relating to the facts and circumstances surrounding the failed asset purchase negotiations between MDI-NC and Insight (the "Failed Asset Purchase" or "Asset Purchase"). *Insight Health Corp.*, 2017 NCBC LEXIS 14, at *10. Particularly, MDI-NC asserted counterclaims for fraud in the inducement and unfair or deceptive trade practices, alleging that Insight induced MDI-NC to take itself off the market and enter into the MRI Agreement with Insight when, in reality, Insight never intended to pay a reasonable price for MDI-NC's assets. (Am. Countercl. ¶¶ 32–43, ECF No. 127.) MDI-NC's affirmative defenses also related to the Failed Asset Purchase negotiations. *Insight Health Corp.*, 2017 NCBC LEXIS 14, at *21.

16. In an Order and Opinion entered February 24, 2017, the Court granted summary judgment for Insight as to MDI-NC's counterclaims after concluding MDI-

---

[1] The Court's previous Opinions and the pleadings in this case may state which claims were asserted against which Defendants differently. For example, the Amended Complaint asserted claims for breach of fiduciary duty and constructive fraud against MDI, Luke, Venesky, and Gentry. (Am. Compl. 23–24.) The Court describes the claims herein as they were agreed upon by the parties at trial and consistent with how the issues were submitted to the jury.

NC had not offered sufficient evidence of fraud or unfair or deceptive trade practices to survive Insight's Motion for Partial Summary Judgment. *Id.* at *17, *20–21. The Court also dismissed MDI-NC's affirmative defenses and granted partial summary judgment for Insight on its breach of contract claim as to liability after concluding that the Failed Asset Purchase and the MRI Agreement were distinct transactions and that the failure of the first did not provide MDI-NC with a justification to breach the second. *Id.* at *28. The Court denied Insight's Motion for Summary Judgment with regard to (i) the issue of damages for Insight's breach of contract claim, (ii) Insight's claim for unfair or deceptive trade practices, and (iii) Insight's request that the Court pierce the corporate veils of MDI-NC and MDI. *Id.* at *50–51.

17. During the months preceding trial, Insight voluntarily dismissed its Second Cause of Action—the fraudulent transfer claim—and its Fourth Cause of Action—the wrongful distribution and personal liability claim. Insight also filed a motion *in limine* (the "Motion *in Limine*") that, among other things, requested that the Court prevent Defendants from introducing evidence or argument relating to the Failed Asset Purchase, including the negotiations leading up to the dissolution of the potential deal. Defendants argued against the Motion *in Limine*, contending that evidence of the Failed Asset Purchase was relevant because it explained why Defendants stopped paying Insight.

18. In an Order and Opinion entered October 3, 2017, the Court addressed Insight's Motion *in Limine*. The Court concluded that evidence or argument referring to the Failed Asset Purchase was not relevant to Insight's claims for breach of

fiduciary duty or constructive fraud. *Insight Health Corp.*, 2017 NCBC LEXIS 91, at *19–20. The Court also concluded that evidence of the Failed Asset Purchase might be relevant to Insight's request to pierce the corporate veil, but only to the extent Insight sought to argue or introduce evidence suggesting that Defendants intentionally undercapitalized MDI-NC. *Id.* at *20. The Court deferred ruling on the admissibility of evidence concerning the Failed Asset Purchase in connection with Insight's claim for unfair or deceptive trade practices, concluding that, while neither proof of intent, nor bad faith, nor deliberate acts were necessary elements of the claim, the Failed Asset Purchase could become relevant if Insight attempted to pursue its claim by alleging intent on the part of Defendants, e.g., attempting to prove unfair or deceptive trade practices by facts amounting to fraud. *Id.* at *15–17.

19. On the first day of trial, Insight indicated that it had structured its case and planned its evidence in such a way that it did not intend to introduce evidence of improper motives on the part of Defendants with regard to any of its claims. Insight followed through on this representation, and evidence of the Failed Asset Purchase was not introduced at trial.

20. After Insight concluded its case-in-chief, Defendants moved for directed verdict on several issues, including Insight's claim for unfair or deceptive trade practices and Insight's request that the Court pierce the corporate veils of MDI-NC and MDI. The Court granted Defendants' motion as to Insight's claim for unfair and deceptive trade practices, holding that Defendants' alleged failure to pay a creditor a pro rata share of MDI-NC's assets while the company wound up did not fall within

the scope of N.C. Gen. Stat. § 75-1.1. *See White v. Thompson*, 364 N.C. 47, 51–52, 691 S.E.2d 676, 679 (2010) (explaining that section 75-1.1 applies to acts "in or affecting commerce," that commerce is defined as "business activities," and that "business activities . . . connote[] the manner in which businesses conduct their *regular, day-to-day activities, or affairs*, such as the purchase and sale of goods, or whatever other activities the business *regularly engages in* and *for which it is organized*" (emphasis added)).[2] The Court denied Defendants' motion seeking dismissal of Insight's veil-piercing request.

21. After the close of the evidence and the charge conference, the Court instructed the jury on the law they were to apply. The Court, in its discretion, permitted the jury to have a written copy of the Jury Instructions as they deliberated. As to Insight's request that the Court pierce the corporate veil, the Court submitted two special issues to the jury (the sixth and seventh) and instructed the jury as to each of the issues in accordance with controlling law:

> The SIXTH issue reads as follows:
>
> Did the Defendant MDI control Defendant MDI-NC with regard to the breach of contract that damaged InSight?
>
> On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove, by the greater weight of the evidence, three things:
>
> First, that MDI controlled the conduct of MDI-NC with respect to the breach of the MRI Agreement to such an extent that MDI-NC had no separate mind, will or existence of its own. Such control means more than mere majority or complete ownership. It means such complete domination of the finances, policy making and business practices of MDI-NC with respect to the

---

[2] Up until this point, Gentry had also been a defendant in the case. Because Insight's section 75-1.1 claim was the only claim remaining against Gentry, however, the Court's dismissal of that claim as to all Defendants dismissed Gentry from the case.

event which damaged the plaintiff that MDI-NC had at the time no separate mind, will or existence of its own.

In determining whether such control existed at the time of the event, you may consider the following factors:

- Whether MDI-NC's members, managers, or officers complied with the formalities typical of organizations of its kind.

- Whether MDI completely dominated and controlled MDI-NC so that it had no independent identity.

- Whether MDI-NC's and MDI's business was a single enterprise that was excessively fragmented into multiple companies. The term "excessive fragmentation," as used here, implies division which does not serve a substantial legitimate business purpose."

- Whether MDI siphoned funds from MDI-NC for the benefit of MDI or other entities related to MDI or its owners. The term "siphoned" means transfer or withdrawal of funds without a substantial legitimate business purpose.

- Whether the managers or officers of MDI-NC were actually functioning and performing the duties of their respective offices in MDI-NC.

- Whether MDI-NC was properly maintaining ordinary and necessary company records.

- Whether MDI-NC had made distributions.

- You may also consider as additional factors that plaintiff has not offered evidence that MDI-NC was inadequately capitalized or insolvent.

It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors, which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had "no separate mind, will or existence of its own" and was therefore the "mere instrumentality or tool of the dominant" LLC or member.

Second, that MDI used its control over MDI-NC to act or fail to act in violation of InSight's legal rights.

The "control" must have been used by the defendant MDI to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights. A breach of a contract is a violation of a positive legal duty.

Third, that MDI's control over MDI-NC, and the use of that control to violate InSight's legal rights, proximately caused damage to InSight.

Proximate cause is a cause which in a natural and continuous sequence produces a person's damage and is a cause which a reasonable and prudent person could have foreseen would probably produce such damage or some similar injurious result. There may be more than one proximate cause of damage. Therefore, the plaintiff need not prove that the defendant MDI's conduct was the sole proximate cause of the damage. The plaintiff must prove, by the greater weight of the evidence, only that the defendant MDI's conduct was a proximate cause.

Finally, as to this SIXTH issue on which the plaintiff has the burden of proof, if you find by the greater weight of the evidence that MDI controlled MDI-NC with respect to the breach of contract that damaged InSight, then it would be your duty to answer this issue "Yes" in favor of the plaintiff.

If, on the other hand, you fail to so find, then it would be your duty to answer this issue "No" in favor of MDI.

The SEVENTH issue reads as follows:

Did Defendant Luke and/or Defendant Venesky control MDI and MDI-NC with regard to the breach of contract that damaged InSight?

You will answer this issue only if you have answered Issue 6 "Yes" in favor of the plaintiff.

On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove, by the greater weight of the evidence, three things:

First, that Defendants Luke and/or Venesky controlled the conduct of MDI and MDI-NC with respect to the breach of the MRI Agreement to such an extent that MDI and MDI-NC had no separate mind, will or existence of their own. Such control means more than mere majority or complete ownership. It means such complete domination of the finances, policy making and business practices of MDI and MDI-NC with respect to the event which

damaged the plaintiff that MDI and MDI-NC had at the time no separate mind, will or existence of their own.

In determining whether such control existed at the time of the event, you may consider the following factors:

- Whether MDI's members, managers, or officers complied with the formalities typical of organizations of its kind.

- Whether Defendants Luke and/or Venesky completely dominated and controlled MDI and MDI-NC so that they had no independent identity.

- Whether Defendant Luke's and/or Defendant Venesky's business was a single enterprise that was excessively fragmented into multiple companies. The term "excessive fragmentation," as used here, implies division which does not serve a substantial legitimate business purpose.

- Whether MDI had made distributions.

- Whether Defendants Luke and/or Venesky had siphoned funds from MDI and MDI-NC for the benefit of themselves or other entities owned by them. The term "siphoned" means transfer or withdrawal of funds without a substantial legitimate business purpose.

- Whether the members, managers, or officers of MDI were actually functioning and performing the duties of their respective offices in MDI.

- Whether MDI was properly maintaining ordinary and necessary company records.

- You may also consider as additional factors that plaintiff has not offered evidence that MDI-NC was inadequately capitalized or insolvent.

It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors, which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool of the dominant" LLC or member.

Second, that Defendants Luke and/or Venesky used their control over MDI and MDI-NC to act or fail to act in violation of InSight's legal rights.

The "control" must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights. A breach of a contract is a violation of a positive legal duty.

Third, that Defendant Luke's and/or Defendant Venesky's control over MDI and MDI-NC, and use of that control, to act or fail to act in violation of InSight's legal rights proximately caused damage to InSight.

Proximate cause is a cause which in a natural and continuous sequence produces a person's damage and is a cause which a reasonable and prudent person could have foreseen would probably produce such damage or some similar injurious result. There may be more than one proximate cause of damage. Therefore, the plaintiff need not prove that the defendants' conduct was the sole proximate cause of the damage. The plaintiff must prove, by the greater weight of the evidence, only that the defendants' conduct was a proximate cause.

Finally, as to this SEVENTH issue on which the plaintiff has the burden of proof, if you find by the greater weight of the evidence that Defendants Luke and/or Venesky controlled MDI and MDI-NC with respect to the breach of contract that damaged InSight, then it would be your duty to answer this issue "Yes" in favor of the plaintiff.

If, on the other hand, you fail to so find, then it would be your duty to answer this issue "No" in favor of Defendants Luke and/or Venesky.

In evaluating the factors related to ISSUES 6 AND 7, regarding control over the defendants MDI and MDI-NC, you may consider the following principles related to Limited Liability Companies, which are also called LLCs:

(1) An LLC is an entity distinct from its interest owners.

(2) In North Carolina, an LLC has the same powers as an individual or a domestic corporation to do all things necessary or convenient to carry out its business.

(3) To form an LLC in North Carolina, one or more persons must file executed articles of organization with the secretary of state's office.

(4) In North Carolina, an LLC must file an annual report with the secretary of state.

(5) To form an LLC in Delaware, one or more persons must execute a certificate of formation which shall be filed in the office of the secretary of state.

(6) Operating Agreements govern the internal affairs of an LLC and the rights, duties and obligations of the interest owners.

(7) The fact that an individual has a management role in an LLC cannot, standing alone, establish that an individual exercised control over the LLC.

(8) The purpose of the North Carolina LLC Act is to provide a flexible framework under which one or more persons may organize and manage one or more businesses as they determine to be appropriate with minimum prescribed formalities or constraints.

(Jury Instructions 19–26.)

22. The jury returned a verdict in Insight's favor on all issues, including the following:

ISSUE 1: What amount is the plaintiff entitled to recover from MDI-NC for breach of contract?

___$3,014,925___

. . . .

ISSUE 6: Did the Defendant MDI control MDI-NC with regard to the breach of contract that damaged InSight?

___Yes___ (YES/NO)

. . . .

ISSUE 7:  Did Defendant Luke and/or Defendant Venesky control MDI and MDI-NC with regard to the breach of contract that damaged InSight?

    (a)    Defendant John K. Luke: <u>    Yes    </u> (YES/NO)

    (b)    Defendant Gene Venesky:<u>    Yes    </u> (YES/NO)

ISSUE 8:  Did Defendants Luke and Venesky breach their fiduciary duty to Insight at any time after the fiduciary duty arose?

    (a)    Defendant John K. Luke: <u>    Yes    </u> (YES/NO)

    (b)    Defendant Gene Venesky:<u>    Yes    </u> (YES/NO)

. . . .

ISSUE 9:  What amount is the plaintiff entitled to recover from the defendants Luke and/or Venesky as damages for breach of fiduciary duty?

    (a)    Defendant John K. Luke: <u>    $994,925.25</u>

    (b)    Defendant Gene Venesky:<u>    $994,925.25</u>

ISSUE 10:  Did defendants Luke and Venesky take advantage of a position of trust and confidence by failing to pay debts of MDI-NC pro rata or by diverting funds of MDI-NC to pay debts of other businesses in which Defendant Luke and Defendant Venesky had a financial interest, instead of paying InSight?

    (a)    Defendant John K. Luke: <u>    Yes   </u> (YES/NO)

    (b)    Defendant Gene Venesky:<u>    Yes   </u> (YES/NO)

(Verdict Sheet 1–3.)

23.	Based on the jury's verdict and the arguments of counsel, the Court ordered further briefing on whether the corporate veils of MDI-NC and MDI should be pierced to hold Luke and Venesky liable for MDI-NC's breach of contract.  Insight's Motion for Fees and Interest was also briefed during this time.

24.	Shortly after briefing was complete on Insight's request to pierce the corporate veil, each remaining Defendant initiated proceedings in the United States

Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") under Chapters 7 or 11 of the United States Bankruptcy Code. (Pl.'s Reply Defs.' Br. Opp'n Pl.'s Mot. Attorneys' Fees, Interest & Costs [hereinafter "Pl.'s Fees Reply"] Exs. A, B, C, ECF. No. 227.) Recognizing that "[t]he filing of a petition for bankruptcy under Chapters 11 or 7 of the United States Bankruptcy Code 'operates as a stay, applicable to all entities, of the commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case [under 11 U.S.C. § 362(a)(1)],'" the Court ordered a stay of further activity in this case on March 7, 2018 "pending further order of the Court or a modification of the automatic stay provided by 11 U.S.C. § 362." (Order Concerning Bankruptcy Stay ¶¶ 5–6, ECF No. 226.)

25. On May 8, 2018, the Bankruptcy Court entered an order in each of Defendants' bankruptcy cases modifying the automatic stay for certain limited purposes. The Bankruptcy Court's orders authorized this Court to rule on the issues pending before it that were otherwise fully briefed prior to the bankruptcy petitions and to enter any appropriate orders and judgments against each Defendant based on the Court's rulings. (Pl.'s Fees Reply Exs. A, B, C.) The Bankruptcy Court's May 8 orders also allowed Insight to file its reply brief supporting the Motion for Fees and Interest and authorized this Court to rule on matters raised by that motion as well.

26. The veil piercing issue and Insight's Motion for Fees and Interest are now ripe for resolution. The Court determines that veil piercing is appropriate, enters

judgment, and awards interest. The Court will address Insight's request for attorneys' fees and costs in a separate order.

## II.

## CONCLUSIONS OF LAW: PIERCING THE CORPORATE VEIL

27. "There is a consensus that the whole area of limited liability, and conversely of piercing the corporate veil, is among the most confusing in corporate law." Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 89 (1985). "The general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *Green v. Freeman*, 367 N.C. 136, 144–45, 749 S.E.2d 262, 270 (2013) (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438, 666 S.E.2d 107, 112 (2008)). The law of North Carolina, however, has long recognized "that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). Put simply, "[p]iercing the corporate veil sets aside [the] general rule [of limited liability] and allows a plaintiff to impose legal liability for a corporation's obligations, or for torts committed by the corporation, upon some other company or individual that controls and dominates a corporation." *Green*, 367 N.C. at 145, 749 S.E.2d at 270. The doctrine applies to LLCs as well as to corporations. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 576, 748 S.E.2d 568, 573 (2013). Veil piercing "is not a theory of liability" but a form of relief that provides an "avenue to pursue legal claims

against" those "otherwise shielded by the corporate form." *Green*, 367 N.C. at 146, 749 SE.2d at 271.

A.    The Instrumentality Rule

28.    The Supreme Court of North Carolina has cautioned that "[d]isregarding the corporate form is not to be done lightly," *id.* at 145, 749 S.E.2d at 270, conscious of "the fact that a judgment in this area requires a peculiarly individualized and delicate balancing of competing equities," *Ridgeway Brands Mfg., LLC*, 362 N.C. at 440, 666 S.E.2d at 113.  Nevertheless, to achieve "uniformity and predictability in this critical area of jurisprudence," our Supreme Court has adopted the "instrumentality rule" for piercing.  *Id.*

29.    Under the instrumentality rule, a plaintiff must prove three elements before a court will pierce the corporate veil:

(1)  Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2)  Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3)  The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn*, 313 N.C. at 455, 329 S.E.2d at 330.  Our Supreme Court has also stated "that domination sufficient to pierce the corporate veil need not be limited to the particular transaction attacked," though it will rarely be the case that "the domination does not

extend to the transaction attacked." *Id.* at 456, 329 S.E.2d at 331; *see also State ex rel. Utils. Comm'n v. Nantahala Power & Light Co.*, 313 N.C. 614, 729, 332 S.E.2d 397, 464 (1985) ("Rather, the separate corporate entity would be disregarded in those cases in which one affiliated corporation is shown to be without a separate and distinct corporate identity and is operated as a mere shell, created to perform a function for an affiliated corporation or its common shareholders without the necessity of proving that the control was also exercised over the *particular* transaction attacked." (internal quotation marks omitted)), *rev'd on other grounds*, *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986).

30.　In determining whether the first element of the instrumentality rule has been satisfied, numerous factors may be considered, including:

[a]　Inadequate capitalization ("thin incorporation").

[b]　Non-compliance with corporate formalities.

[c]　Complete domination and control of the corporation so that it has no independent identity.

[d]　Excessive fragmentation of a single enterprise into separate corporations.

*Id.* at 455, 458, 329 S.E.2d at 330–32 (citations omitted) ("We emphasize, these are merely factors to be considered to determine whether sufficient control and domination is present to satisfy the first prong of the three-pronged rule known as the instrumentality rule."). When a plaintiff seeks to pierce the corporate veil of an LLC, rather than a corporation, these factors may be weighed differently. *S. Shores*

*Realty Servs. v. Miller*, 796 S.E.2d 340, 352 (N.C. Ct. App. 2017) (noting "that all members of an LLC are statutorily deemed to be managers").

B. <u>Defendants' Request that the Court Refrain from Piercing the Corporate Veil</u>

31. Despite the jury's verdict, Defendants contend that the Court retains discretion on whether to afford Insight piercing relief. Defendants ask the Court to refuse to pierce the corporate veils of MDI-NC and MDI because doing so "would be unjust, inequitable and fundamentally inconsistent with the liability protections afforded by . . . North Carolina Limited Liability Compan[ies]." (Br. Opp'n Piercing Corporate Veils MDI & MDI-NC 2, ECF No. 203.)[3]

32. Defendants' request highlights a relatively opaque area of the instrumentality rule doctrine. On one hand, our Supreme Court has stressed that "the instrumentality rule is an equitable doctrine," *Glenn*, 313 N.C. at 458, 329 S.E.2d at 332, and that decisions in this area are "founded in equity" and require a "delicate balancing of competing equities," *Ridgeway Brands Mfg., LLC*, 362 N.C. at 440, 666 S.E.2d at 113 (quoting Russell M. Robinson, II, *Robinson on North Carolina Corporate Law* § 2-10[2] (7th ed. 2006)). As a general principle, courts retain great

---

[3] To date, all parties in this case have agreed that North Carolina law applies to Insight's request to pierce MDI's veil, even though MDI is a Delaware LLC. (*See* Pl.'s Proposed Jury Instrs. & Joint Description Case 23–24, ECF No. 195; Defs.' Proposed Jury Instrs. 15–19, ECF No. 192.) Recognizing that "North Carolina courts have not ruled definitively" on the choice of law for veil piercing, *Strategic Outsourcing, Inc. v. Stacks*, 176 N.C. App. 247, 252–53, 625 S.E.2d 800, 804 (2006), the Court elects to follow the North Carolina Court of Appeals' previous example set in a factually similar case, *Copley Triangle Associates v. Apparel America, Inc.*, 96 N.C. App. 263, 385 S.E.2d 201 (1989), and applies North Carolina veil-piercing law to both LLC Defendants.

discretion over whether to grant or deny requests for equitable relief. *Roberts v. Madison Cty. Realtors Ass'n*, 344 N.C. 394, 399, 474 S.E.2d 783, 787 (1996). Our Court of Appeals has also, on one occasion, denied a party veil-piercing relief on apparently equitable grounds. *Swan Quarter Farms, Inc. v. Spencer*, 133 N.C. App. 106, 110, 514 S.E.2d 735, 738 (1999).

33. On the other hand, our Supreme Court has also stated that the purpose of the instrumentality rule is to achieve "uniformity and predictability," *Ridgeway Brands Mfg., LLC*, 362 N.C. at 440, 666 S.E.2d at 113, that "the issue is one of fact," *Glenn*, 313 N.C. at 459, 329 S.E.2d at 333, and that "the fact finder determines that the corporate veil should be pierced," *Green*, 367 N.C. at 145, 749 S.E.2d at 270.[4] Whether, or to what extent, the Court may elect not to pierce the corporate veil as a matter of equity—as Defendants urge it to now—when the jury has found the elements of the instrumentality rule satisfied, as it has here, is unclear.

34. The Court finds itself with limited guidance from the parties and North Carolina case law on how to proceed. Defendants do not suggest a clear framework for their proposed post-jury-verdict weighing of equities, nor does their briefing offer any guidance on how the Court should weigh their arguments against the jury's verdict. Insight, in support of its position, notes that "there appears to be no reported

---

[4] Although this excerpt from *Green* appears at first blush to settle the issue before the Court, the language quoted here was not essential to the Supreme Court's decision and was not the focus of the quoted sentence. *See Green*, 367 N.C. at 145–46, 749 S.E.2d at 270–71 (remanding the case for further consideration of plaintiff's claims underlying plaintiff's request for veil piercing). Furthermore, the Supreme Court in *Green* did not address whether, or how, equitable considerations affect the outcome of a request to pierce the corporate veil.

North Carolina case where the trial court did not pierce the veil after the fact finder determined the elements of the instrumentality rule were satisfied." (Pl.'s Post-Trial Br. Piercing Corporate Veil 4, ECF No. 204.) Indeed, to the Court's knowledge, there are no North Carolina decisions directly addressing this issue.

35. Looking to other jurisdictions, there does not appear to be a general consensus on the appropriate procedure for veil piercing. State and federal courts in several jurisdictions expressly leave the decision to set aside the corporate form to the trial court. *See, e.g.*, Nev. Rev. Stat. § 78.747 (creating by statute an "alter ego" theory of piercing in Nevada and characterizing the decision to pierce as a "matter of law"); *In re Air Crash Disaster at Stapleton Int'l Airport, Denver*, 720 F. Supp. 1467, 1484 (D. Col. 1989) ("As a factual predicate to disregarding the corporate form, plaintiff must establish . . . that one [corporation] is nothing more than the mere instrumentality of the other. But the ultimate decision of whether to disregard the corporate form, and the underlying public policy on which it is based, lies in equity." (internal citations omitted)); *Mark Heisz & Aegis Strategic Inv. Corp. v. Galt Indus.*, 93 So. 3d 918, 929 (Ala. 2012) ("Whether the corporate veil of a business entity should be pierced is a matter of equity, properly decided by a judge after a jury has resolved the accompanying legal issues."); *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 373 (Idaho 2014) (holding that the trial court is responsible for determining the factual issues connected to a piercing request, but the court may empanel an advisory jury whose findings the court may accept or reject); *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 213 (Ky. Ct. App. 2009) ("[T]he decision as to

whether to pierce the corporate veil is an equitable one to be decided by the trial court and not the jury.").

36. Other states appear to allow juries to decide whether to pierce a corporation's veil. *See, e.g.*, *Acadia Partners, L.P. v. Tompkins*, 759 So. 2d 732, 735 (Fla. Dist. Ct. App. 2000) (noting that the jury below found a party's corporate veil should be pierced); *OMV Assocs., L.P. v. Clearway Acquisition, Inc.*, 976 N.E.2d 185, 189–190 (Mass App. Ct. 2012) (affirming JNOV where there was insufficient evidence for the jury's decision to set aside the corporate form); *Chopra v. U.S. Prof'ls, LLC*, No. W2004-01189-COA-R3-CV, 2005 Tenn. App. LEXIS 62, at *13 (Tenn. Ct. App. Feb. 2, 2005) (characterizing the decision to pierce the corporate veil as "within the province of the finder of fact"). The reasoning used to justify this approach is similar to that discussed in North Carolina's jurisprudence. *Compare Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985) ("The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court. Moreover, a determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact for the jury."), *with Glenn*, 313 N.C. at 459, 329 S.E.2d at 333 (noting that each case for piercing is unique and that the issues underlying the instrumentality rule are factual). As far as this Court's research has revealed, however, none of these jurisdictions has expressly addressed whether equitable

considerations may permit a court to override a jury's findings under a doctrine similar to the instrumentality rule.

37. Recognizing this lack of clear precedent, the Court nonetheless synthesizes the relevant North Carolina cases to suggest that the jury is to decide whether a corporation's veil is pierced through its factual findings and that the trial court is to enter judgment accordingly. *See Green*, 367 N.C. at 145, 749 S.E.2d at 270; *Glenn*, 313 N.C. at 459, 329 S.E.2d at 333. Although not yet specifically addressed by our Supreme Court, it also appears that piercing relief may be subject to equitable defenses in the appropriate case. *Swan Quarter Farms, Inc.*, 133 N.C. App. at 110, 514 S.E.2d at 738.

38. Accordingly, to the extent North Carolina law leaves the determination of veil piercing to the jury through its factual findings on the factors and elements of the instrumentality rule,[5] the Court concludes that the jury's findings here mandate that judgment be entered for Insight holding MDI, as the sole member of MDI–NC, and Luke and Venesky, as members and managers of MDI, jointly and severally liable with MDI-NC for Insight's damages under the equitable remedy of piercing the corporate veil.

39. To the extent the Court possesses the ability to engage in a post-trial balancing of the equities in making a final determination on piercing—as Defendants suggest it does—the Court concludes that the facts before it strongly support piercing

---

[5] *See* N.C.P.I.-Civ. 103.40 (gen. civ. vol. June 2014).

the corporate veils of MDI-NC and MDI. The Court bases its balancing analysis on the following points of law.

40. First, trial courts are given great discretion to grant, deny, and shape equitable relief. *Roberts*, 344 N.C. at 399, 474 S.E.2d at 787 (citing 1 Dan B. Dobbs, *Law of Remedies* § 2.9(2) (2d ed. 1993)); *Fed. Point Yacht Club Ass'n v. Moore*, 233 N.C. App. 298, 318, 758 S.E.2d 1, 13 (2014). "This discretion is normally invoked by considering an equitable defense, such as unclean hands or laches, or by balancing equities, hardships, and the interests of the public and of third persons." *Roberts*, 344 N.C. at 399, 474 S.E.2d at 787.

41. Second, when a plaintiff seeks to have the corporate veil pierced, "the burden [is] on the plaintiff to establish the existence of factors that would justify disregarding the corporate entity." *Glenn*, 313 N.C. at 459, 329 S.E.2d at 333. It thus appears Insight bears the burden in any postjudgment proceeding concerning piercing the corporate veil.

42. Third, North Carolina law clearly indicates that it is proper for a court to submit the elements of the instrumentality rule to the jury for decision. *See Glenn*, 313 N.C. at 459, 329 S.E.2d at 333.

43. Fourth, except for those means by which the judge may set aside a jury's verdict, a trial court is bound by the jury's findings in post-trial proceedings. *Jyachosky v. Wensil*, 240 N.C. 217, 229, 81 S.E.2d 644, 652 (1954); *cf. Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir. 1992) ("[A]ny actual issues necessarily and actually decided by the jury are foreclosed under settled principles of

collateral estoppel from subsequent reconsideration by the district court." (quoting *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 844 (7th Cir. 1978))). This is equally true where the judge must rule on equitable remedies. *Whitted v. Fuquay*, 127 N.C. 68, 70, 37 S.E. 141, 142 (1900) ("[W]e do not suppose the [c]ourt, though passing upon an equitable demand, would be at liberty to disregard the findings of the jury[.]").

44. Insight's damages on its breach of contract claim and its request for veil piercing were tried before a jury, which returned factual findings. Thus, in applying the above principles of law, the Court must also consider the following facts found by the jury.

45. First, the jury concluded that Luke and Venesky controlled MDI-NC and MDI with regard to the breach of contract that damaged Insight. In so finding, the jury necessarily found (1) that Luke and Venesky "controlled the conduct of MDI-NC [and MDI] with respect to the breach of the MRI Agreement to such an extent that MDI-NC [and MDI] had no separate mind, will or existence of [their] own"; (2) that Luke and Venesky used their control to act in violation of Insight's legal rights; and (3) that Luke's and Venesky's use of that control was the proximate cause of Insight's injury. (Jury Instructions 22–24.)

46. Second, the jury found that Luke and Venesky breached their fiduciary duties to Insight. The jury so found after being instructed as follows:

> You are instructed that Luke and Venesky were the managers of Defendant MDI-NC, [that] plaintiff InSight was a creditor of defendant MDI-NC, and that there were circumstances amounting to a winding up or dissolution of MDI-NC beginning November 15, 2013. You are instructed

that, under such circumstances, a relationship of trust and confidence existed in which Luke and Venesky as managers of MDI-NC were required to act in the best interest of creditors, including InSight

The law provides that once a manager's fiduciary duty to creditors arises, a manager is generally prohibited from taking advantage of his intimate knowledge of the LLC's affairs and his position of trust for his own benefit and to the detriment of the creditors to whom he owes the duty. Additionally, once a manager's fiduciary duty arises, he or she must treat all creditors of the same class equally by making any payments to such creditors on a pro rata basis. . . .

. . . .

. . . [I]f you find, by the greater weight of the evidence, that the defendants breached their fiduciary duty by (i) failing to pay debts of MDI-NC pro rata, to the detriment of the plaintiff and for the benefit of themselves, or (ii) diverting funds of MDI-NC to pay debts of other businesses in which Defendant Luke and Defendant Venesky had a financial interest, instead of paying InSight, to the detriment of the plaintiff and for the benefit of themselves, then it would be your duty to answer this issue "Yes" in favor of the plaintiff.

(Jury Instructions 27–28.)  The jury thus found that Luke and Venesky used their positions at MDI-NC and MDI to cause MDI-NC to fail to pay Insight the pro rata share of MDI-NC's debt that Insight was owed while MDI-NC was winding up.

47.    Third, on the issue involving constructive fraud, the Court instructed the jury as follows:

On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove, by the greater weight of the evidence, two things:

First, that a relationship of trust and confidence existed between the plaintiff and the defendants Luke and Venesky. You are instructed that such a relationship of trust and confidence existed here.

And Second, that the defendants Luke and Venesky used their position of trust and confidence to bring about transactions to the detriment of plaintiff and for the benefit of themselves. . . .

. . . .

. . . [I]f you find, by the greater weight of the evidence, that the defendants Luke and Venesky took advantage of a position of trust and confidence to bring about either [(i)] the failure to pay debts of MDI-NC pro rata, to the detriment of the plaintiff and for the benefit of the defendants Luke and Venesky, or (ii) the diversion of funds of MDI-NC to pay debts of other businesses in which Defendant Luke and Defendant Venesky had a financial interest, instead of paying InSight, to the detriment of the plaintiff and for the benefit of the defendants Luke and Venesky, then it would be your duty to answer this issue "Yes" in favor of the plaintiff.

(Jury Instructions 31–32.) The jury answered this issue "Yes," finding that Luke and Venesky used their positions as managers of a winding-up LLC to bring about transactions benefitting themselves and injuring Insight.

48. These findings weigh heavily in favor of concluding that Insight has met any postjudgment burden that may exist under North Carolina's approach to piercing the corporate veil. Defendants' arguments to the contrary are unpersuasive.

C. Defendants' Arguments Against Piercing

49. Defendants' arguments can be grouped into three categories: (i) the array of claims in this case does not merit piercing; (ii) evidence of the Failed Asset Purchase, and the exclusion of that evidence at trial, makes it inequitable to pierce the corporate veils of MDI-NC and MDI; and (iii) Insight's knowledge and the manner in which it conducted itself prior to this lawsuit should preclude piercing. The Court addresses each set of arguments in turn.

1. Breach of Contract as the Basis for Piercing

50. Defendants first argue that the evidence at trial, and the jury's determination that Luke and Venesky controlled MDI and MDI-NC as to the breach

of contract that damaged Insight, are insufficient, as a matter of equity, to support piercing the veils of each LLC because the evidence shows Insight voluntarily dealt with MDI-NC without seeking or obtaining personal guarantees from either individual Defendant. Defendants also argue that piercing is especially unjustified in this case because Insight is able to recover against Luke and Venesky personally through its claims for breach of fiduciary duty and constructive fraud. The Court disagrees with both contentions.

51. Defendants rely heavily on *Statesville Stained Glass, Inc. v. T.E. Lane Construction & Supply Co.*, 110 N.C. App. 592, 430 S.E.2d 437 (1993), for the proposition that Insight should be denied veil-piercing relief because it chose to contract only with MDI-NC. Our Court of Appeals, however, has clarified that *Statesville Stained Glass* does not stand for the proposition that a claimant is precluded from piercing the corporate veil to recover from a party with which the claimant has not contracted. *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 654–55, 689 S.E.2d 143, 150 (2009) ("[T]he claims asserted by the plaintiff in *Statesville Stained Glass* failed because the plaintiff failed to provide sufficient evidentiary support for them, not because those claims were not cognizable under North Carolina law."). To the contrary, a breach of contract may support a request to pierce the corporate veil. *See S. Shores Realty Servs.*, 796 S.E.2d at 346–47, 351–54 (affirming denial of motions for directed verdict and JNOV when the jury determined the defendant used his control over several LLCs to disregard a "contractual obligation").

52. The Court determined here, at summary judgment, that MDI-NC breached its contract with Insight. The jury determined that Luke and Venesky controlled MDI-NC and MDI as to this breach of contract such that each LLC was a mere instrumentality of each individual Defendant. Insight's failure to contract with Luke or Venesky personally or obtain a personal guaranty from either will not prevent it from obtaining the relief it seeks.

53. Defendants attempt to avoid this result by further arguing that piercing is not justified in this case because Insight may already recover from Luke or Venesky under its breach of fiduciary duty and constructive fraud claims. For support, Defendants cite *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 560 S.E.2d 817 (2002), in which the plaintiff brought claims against an individual business owner and the trial court correctly refused to instruct the jury on piercing the corporate veil. *Id.* at 37, 560 S.E.2d at 829. But a careful reading of *Keener Lumber Co.* reveals that the Court of Appeals did not affirm the trial court's decision because piercing was unnecessary in light of the individual claims in that case. Instead, the court found that the "plaintiff's complaint [did not warrant] application of [the piercing] doctrine" because the complaint alleged causes of action against the individual owner only— there was no "cause[] of action against [the indebted company] set forth in the complaint for which plaintiff might seek to hold [the owner] liable under a 'piercing the corporate veil' theory." *Id.* Indeed, the company contractually indebted to the plaintiff in *Keener Lumber Co.* was not a party to the lawsuit and had already filed

for bankruptcy. *Id.* at 22–24, 560 S.E.2d at 820–21. In contrast, here Insight has succeeded in bringing a claim against the indebted company, MDI-NC.

54. If the Court refused to pierce MDI-NC's and MDI's corporate veils because Insight has other claims against Luke and Venesky individually, the Court would be allowing Luke and Venesky to take partial shelter behind two LLCs the jury determined Luke and Venesky operated as mere instrumentalities, i.e., Luke and Venesky would only be jointly and severally liable for an amount less than one-third of the amount they would owe for MDI-NC's breach of contract. The instrumentality rule is meant to avoid such results. *See Ridgeway Brands Mfg., LLC*, 362 N.C. at 443, 666 S.E.2d at 115 ("[I]t would be inequitable to permit defendants to shelter behind the corporate identity of the very entity they drained in the course of their actions.").

55. On this point, Defendants also argue that the Court should not consider the jury's verdict on Insight's claims for breach of fiduciary duty and constructive fraud when deciding whether to pierce the corporate veil, as those are issues separate from Insight's breach of contract claim. Defendants overlook, however, the factual significance of the jury's findings on these claims, particularly constructive fraud. In finding for Insight on this claim, the jury necessarily concluded that Luke and Venesky failed to pay Insight its pro-rata share of MDI-NC's debt and instead benefited themselves with MDI-NC's funds. (*See* Jury Instructions 31–32.) These facts further evidence Luke's and Venesky's domination and control of MDI-NC and

MDI and should be given due consideration. *See Glenn*, 313 N.C. at 456, 329 S.E.2d at 331.

56. In sum, Defendants' first set of arguments does not detract from Insight's strong showing in favor of the relief it seeks. The balance of equities favors piercing.

### 2. Exclusion of Facts Concerning the Failed Asset Purchase

57. Defendants' second argument against piercing centers on the Court's decision to exclude from trial evidence concerning the Failed Asset Purchase. Defendants contend that while the jury did not hear evidence about the Failed Asset Purchase and Defendants' belief that Defendants were justified in breaching the MRI Agreement because Insight backed out of the Asset Purchase, the Court is aware of these facts, should consider them, and should conclude that piercing MDI-NC's and MDI's corporate veils would be inequitable.

58. Defendants' request that the Court now consider evidence concerning the Failed Asset Purchase is at odds with the Court's previous decision on Insight's Motion *in Limine*. The Court held that evidence of the Failed Asset Purchase was only relevant to Insight's request to pierce the corporate veil to the extent Insight sought to prove that Defendants intentionally undercapitalized MDI-NC. *Insight Health Corp.*, 2017 NCBC LEXIS 91, at *13. Insight did not attempt to argue or offer evidence on this point at trial, and the jury was instructed that they could consider, when determining whether Luke and Venesky controlled MDI-NC and MDI, that Insight had not offered evidence that MDI-NC was undercapitalized.

59. The Court did not exclude evidence of the Failed Asset Purchase in this case because it concluded the evidence could confuse the jury and was better left for the Court to weigh. Rather, the Court excluded this evidence because the Court could not "conclude that evidence of the Failed Asset Purchase would make it more or less probable that Defendants respected the formalities of operating an LLC, completely dominated MDI-NC, or excessively fragmented a single enterprise into multiple entities." *Id.* Under the instrumentality rule, the law focuses on Luke's and Venesky's operation of MDI and MDI-NC, not the reasons why Luke and Venesky felt their breach of the MRI Agreement was justified. *See Glenn*, 313 N.C. at 458, 329 S.E.2d at 332. The purpose of the doctrine is not to punish but to "place the burden of the loss upon the party who should be responsible." *See id.* Thus, facts concerning the Failed Asset Purchase were properly excluded from the jury's consideration and do not now provide the Court with a reason to refrain from piercing MDI-NC's and MDI's corporate veils.

60. Defendants also argue that there was insufficient evidence to justify the jury's verdict as to veil piercing, breach of fiduciary duty, and constructive fraud. Defendants contend this is the case because the "Court's pre-trial rulings on Plaintiff's summary judgment motion and motion in limine" prevented the jury from knowing "all the facts"—referring to the Failed Asset Purchase—and thus "the jury did not [know] why . . . MDI, Mr. Luke, and Mr. Venesky refused to make any further payments to Insight after they closed the Asheville center." (Br. Opp'n Piercing Corporate Veils MDI & MDI-NC 2.) As such, Defendants assert, "[t]he verdict reflects

[the jury's] unjustified anger at [Defendants] for failing to give a reasonable explanation for their actions[.]" (Br. Opp'n Piercing Corporate Veils MDI & MDI-NC 2.)

61. Again, the Court disagrees. Evidence of the Failed Asset Purchase was excluded from trial because the Court deemed that evidence irrelevant to Insight's claims for breach of fiduciary duty, *Insight Health Corp.*, 2017 NCBC LEXIS 91, at *8 ("Defendants' subjective belief that they owed no fiduciary duty to Insight because of the Failed Asset Purchase does not change the objective nature of the parties' relationship."), and constructive fraud, *id.* at *9–10 ("Much as Defendants wish to introduce evidence of the Failed Asset Purchase to 'explain their rationale' for failing to pay Insight, that subjective rationale does not make it more or less probable that Defendants obtained a benefit for themselves by breaching an alleged fiduciary duty to Insight." (internal citations omitted)), and—as explained above—Insight's request to pierce the corporate veil, *id.* at *13.

62. The exclusion of this irrelevant evidence has nothing to do with the sufficiency of Insight's proof and thus does not mean that the jury had insufficient evidence to reach its verdict with regard to veil piercing. To the contrary, the jury was presented with evidence that Defendants, among other things, interchangeably identified themselves and MDI as the members of MDI-NC, continued to pay other creditors of MDI-NC after ceasing payments to Insight, took cash out of MDI-NC to pay other entities they owned without proof of intercompany loans or other instruments to formalize the transfers of money, and generally failed to respect MDI-

NC's funds as the property of a separate LLC. For example, when asked to justify their practice of moving funds between MDI-NC and other entities, Luke stated, "[I]t was our money. It was no one else's money." (4 Tr. 694:7–8.)

63. In sum, the Court will not consider evidence previously deemed irrelevant when entering judgment against Defendants for purposes of piercing the corporate veil, and the proper exclusion of that evidence did not deprive the jury of sufficient evidence to reach its verdict. *Cf. S. Shores Realty Servs.*, 796 S.E.2d at 353 (finding sufficient evidence for trial court to deny motions for directed verdict and JNOV when the individual defendant formed multiple LLCs for the purpose of limiting the liability of each LLC, controlled the finances, policies, and business practices of those LLCs, and substituted his own name for the LLCs' names in legal correspondence).

64. However, even if the Court were to consider facts surrounding the Failed Asset Purchase when determining whether to pierce the corporate veil, the Court would still consider piercing an appropriate remedy here for reasons substantially similar to those the Court gave when granting summary judgment on liability for Insight's breach of contract claim. *Insight Health Corp.*, 2017 NCBC LEXIS 14, at *27 ("[The] undisputed facts show that the Insight MRI Agreement was a separate transaction [that] included a merger clause to that effect. MDI-NC has forecast no specific facts or evidence to show that Insight acted dishonestly, fraudulently, deceitfully, or in bad faith, or that the contemplated transaction was unfair.").

65. Thus, to the extent the Court has the discretion to conclude that Insight has not met its burden on its request to pierce the veils of MDI-NC and MDI, or that the

balance of equities weighs against piercing, Defendants' second set of arguments does not present a persuasive reason to do so.

### 3. Insight's Knowledge and Conduct

66. Finally, Defendants argue that Insight should not be able to recover against Luke and Venesky through veil piercing because Insight was fully aware of MDI-NC's financial condition and corporate form before entering into the MRI Agreement. The Court is unpersuaded by this argument as well.

67. Defendants' final argument is closely linked to their first. They point to the fact that Insight voluntarily dealt with MDI-NC alone and chose to deal with the LLC knowing MDI-NC was suffering significant financial hardship. Because Insight entered into the MRI Agreement with its "eyes wide open" and knew the risks of its bargain with the LLC, Defendants contend that equity demands leaving MDI-NC's and MDI's veils intact.

68. Defendants rely heavily on *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 30 (N.C. Super. Ct. Sept. 14, 2007), in which Judge Diaz, then of this Court, noted that an earlier Court of Appeals decision, *Swan Quarter Farms*, suggested that "the conduct of the party seeking [to pierce the corporate veil] may . . . be relevant." *Id.* at *19. What Defendants do not emphasize, however, is that Judge Diaz also noted that "[t]he conduct of the party seeking to pierce the corporate veil is typically not relevant to the analysis. Instead, courts focus on the actions of the corporate entity and the extent to which others exercised control over it." *Id.* at *18. Critically, the exception to the general rule Judge Diaz identified occurred when the party

seeking piercing came to the *Swan Quarter Farms* court "with 'unclean hands.'" *Id.* at *19.

69.    In *Swan Quarter Farms*, the plaintiff, seeking to defend against veil piercing, argued that the defendants could not obtain the equitable remedy of piercing because they had knowingly exploited legal problems affecting the property at issue in the case and thus had "unclean hands." *Swan Quarter Farms, Inc.*, 133 N.C. App. at 109, 514 S.E.2d at 738. After identifying this argument, the court noted that equitable remedies were for "the protection of innocent persons" and should be used to intervene where injustice would otherwise be done. *Id.* at 110, 514 S.E.2d at 738. The court then concluded that the trial court had not erred in refusing to pierce the corporate veil because the defendants were aware of the legal problems surrounding the property and had used those problems to benefit themselves in the past. *Id.*

70.    While the *Swan Quarter Farms* court did not expressly state that unclean hands barred the request to pierce the corporate veil in that case, the application of the doctrine of unclean hands was heavily implied by the court's treatment of the issue, and Judge Diaz correctly characterized the *Swan Quarter Farms* court's holding. In fact, every reported decision of which the Court is aware applying S*wan Quarter Farms* has done so narrowly, most often when a claimant is susceptible to the doctrine of unclean hands. *See, e.g.*, *OMOA Wireless S. Der. L. v. United States*, No. 1:06CV148, 2010 U.S. Dist. LEXIS 82174, at *34 (M.D.N.C. Aug. 11, 2010) ("Equity is for the protection of innocent persons and is a tool used by the court to intervene where injustice would otherwise result. One who comes to the court with

unclean hands is barred from equitable relief."); *Mikels v. Unique Tool & Mfg. Co.*, No. 5:06CV32, 2007 U.S. Dist. LEXIS 91814, at *59 (W.D.N.C. Dec. 3, 2007) ("[O]ne who comes to court with unclean hands is barred from any equitable relief."); *Discovery Ins. Co. v. N.C. Dep't of Ins.*, 807 S.E.2d 582, 594 (N.C. Ct. App. Oct. 3, 2017) (citing *Swan Quarter Farms* for the general proposition "[e]quity is for the protection of innocent persons and is a tool used by the court to intervene where injustice would otherwise result" before concluding that the plaintiff's claim was barred "because of the doctrine of unclean hands").

71. *Swan Quarter Farms*, *Lawrence*, and the other cases cited above demonstrate that Insight's conduct or knowledge is relevant here only to the extent that conduct or knowledge provides Defendants with an equitable defense against Insight's request to pierce the corporate veil. The Court previously determined that Defendants' unclean hands defense and other equitable defenses were deficient as a matter of law. Absent such a defense, our Supreme Court's instruction to focus upon Defendants' "operation of the [entities], and upon [Defendants'] relationship to that operation," *Glenn*, 313 N.C. at 458, 329 S.E.2d at 332, means Luke and Venesky may not avoid personal liability by focusing on Insight's knowledge or conduct rather than their own. Accordingly, for the reasons stated above, the Court finds Defendants' final arguments against piercing unpersuasive.

## III.

## PREJUDGMENT INTEREST

72.     N.C. Gen. Stat. § 24-5 provides for the award of interest in breach of contract cases:

> In an action for breach of contract, except an action on a penal bond, the amount awarded on the contract bears interest from the date of breach. The fact finder in an action for breach of contract shall distinguish the principal from the interest in the award, and the judgment shall provide that the principal amount bears interest until the judgment is satisfied. If the parties have agreed in the contract that the contract rate shall apply after judgment, then interest on an award in a contract action shall be at the contract rate after judgment; otherwise it shall be at the legal rate.

N.C. Gen. Stat. § 24-5. "[T]he parties may by agreement set the rate of interest to be applied in a breach of contract action[.]" *Barret Kays & Assocs., P.A. v. Colonial Bldg. Co.*, 129 N.C. App. 525, 529, 500 S.E.2d 108, 112 (1998). However, "this agreement is controlling with respect to post-judgment interest only if the agreement specifically states that the interest rate is to apply post-judgment. In the absence of such specific language, the agreed to rate shall apply only pre-judgment and the legal rate shall apply post-judgment." *Id.*

73.     In the case at bar, the MRI Agreement provided that an interest rate of 1.5% would be assessed each month on delinquent payments. (Pl.'s Mot. Prejudgment Interest, Fees, & Costs Ex. A. § 4(h) [hereinafter "MRI Agreement"], ECF No. 209.) There was no agreement that this rate would apply postjudgment.

74.     Insight asserts that a simple interest calculation is appropriate under the MRI Agreement and requests prejudgment interest in the amount of $1,459,230. Insight bases this number on its expert, Gary Seelen's, calculation of prejudgment

interest due under the terms of the MRI Agreement from the beginning of the period for which MDI-NC ceased making payments, November 15, 2013, until January 2018. (Pl.'s Mot. Prejudgment Interest, Fees, & Costs Ex. D, at 2, ECF No. 209.) Insight contends that this is the correct calculation of Insight's prejudgment interest under the MRI Agreement, noting that this amount is "significantly less" than the amount received by "applying an 18% per annum interest rate (1.5% per month x 12 months) to the principal amount the jury awarded for breach of contract ($3,014,925)" using the North Carolina Court System's Judgment Calculator Worksheet. (Pl.'s Mot. Prejudgment Interest, Fees, & Costs 13, ECF No. 209.)

75. Defendants do not challenge Insight's calculation. Instead, Defendants object to Insight's request for prejudgment interest by arguing that N.C. Gen. Stat. § 24-5 requires the fact finder to "distinguish principal from interest in the award[.]" (Br. Opp'n Pl.'s Mot. Attorneys' Fees & Interest 2, ECF No. 217.) Defendants argue that Insight did not request such findings and instead had one of its experts, Robert Taylor ("Taylor"), include prejudgment interest in his opinion on damages, which the jury used in rendering their verdict. Defendants characterize Insight's Motion for Fees and Interest as requesting "additional interest" on top of what the jury "evidently already awarded." (Br. Opp'n Pl.'s Mot. Attorneys' Fees & Interest 2.)

76. Defendants' argument does not align with Taylor's testimony at trial or the Court's charge to the jury. In the testimony Defendants reference, Taylor expressly stated that his calculations were "not accruing interest from the date of damage up

to the measurement date." (Tr. 557:12–15.) Several moments earlier, Taylor also stated,

> [A] lot of times there are statutory rates of interest on a prejudgment amount that the Court can say you can calculate. There is no need for me to calculate that because we don't know what the damage is going to be, but the -- what the findings will be. So I've left that out.

(Tr. 556:5–11.) Instead, the calculations Taylor discussed concerned Taylor's attempts to provide the jury with a present value of what Insight's cash flows would have been under the MRI Agreement past the trial date. (Tr. 556:16–557:15.) The calculation was concerned with the value of MDI-NC's performance under the MRI Agreement, not prejudgment interest.

77. The jury found that MDI-NC owed Insight $3,014,925 for breaching the MRI Agreement. The jury so found after being instructed to consider whether Insight was entitled to recover actual damages in the form of direct damages:

> Direct damages are the economic losses that usually or customarily result from a breach of contract.
>
> A person damaged by a breach of contract is entitled to be placed, insofar as this can be done by money, in the same position he would have occupied if there had been no breach of the contract. The law provides that where a defendant has breached a contract, the non-breaching party may recover its lost profits, calculated as the difference between the value of what was received and the value of what was promised.

(Jury Instructions 12.) The jury was not instructed to consider prejudgment interest on MDI-NC's breach of contract, and evidence of interest was not submitted to the jury. Thus, it is proper for the Court's judgment to add prejudgment and postjudgment interest to the jury's verdict on damages. *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 403, 331 S.E.2d 148, 159 (1985) ("[N.C. Gen. Stat. §] 24-5

[does not] require that an issue be submitted to the jury before interest can be allowed in contract cases. The requirement is merely that the jury 'distinguish the principal from the sum allowed as interest,' which obviously pertains only to those rare situations where *evidence as to both principal and interest* is submitted to the jury for their consideration.").

78. For these reasons, the Court concludes that Insight is entitled to prejudgment interest for MDI-NC's breach of contract. Insight asserts that its expert's simple interest calculation is the correct means of determining prejudgment interest under the MRI Agreement, and Defendants do not challenge that assertion. Extending Insight's calculation through the date of entry, the Court will award $1,709,550 in prejudgment interest on Insight's breach of contract claim as well as postjudgment interest at the legal rate.

IV.

CONCLUSION

79. The jury in this case found that MDI-NC and MDI were controlled by Luke and Venesky with regard to the breach of contract that damaged Insight. To the extent the decision to pierce a legal entity's veil is left solely to the jury, the jury here has conclusively determined Insight's entitlement to that relief, and the Court enters judgment accordingly. To the extent the decision to pierce is left to the Court, the Court concludes, after reviewing the jury's findings, considering the evidence admitted at trial and the parties' arguments, and balancing the equities, that MDI-NC's and MDI's corporate veils should be pierced for the reasons explained above.

80.    **WHEREFORE**, for the foregoing reasons, the Court enters **JUDGMENT** as follows:

    a. The limited liability form of MDI-NC and MDI shall be set aside, and Insight shall have and recover from MDI-NC, MDI, Luke, and Venesky, jointly and severally, the principal amount of $3,014,925, plus prejudgment interest in the amount of $1,709,550 and postjudgment interest at the legal rate until paid.

    b. Insight shall have and recover from Luke and Venesky, jointly and severally, $994,925.25, plus postjudgment interest at the legal rate until paid.

    c. Insight's recovery shall be non-cumulative.  The maximum amount to which Insight is entitled is set forth in subparagraph (a) above.  Any amount recovered under subparagraph (b) shall count toward Insight's recovery under subparagraph (a).

    d. The Court retains jurisdiction for the purposes of further considering Insight's request for attorneys' fees and costs.

**SO ORDERED**, this the 5th day of June, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases